# Illinois Official Reports

## Appellate Court

---

### *People v. Sandifer*, 2017 IL App (1st) 142740

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. GREGORY SANDIFER, Defendant-Appellant. |
| District & No. | First District, Fourth Division<br>Docket No. 1-14-2740 |
| Filed | December 14, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 11-CR-16380; the Hon. Clayton J. Crane, Judge, presiding. |
| Judgment | Affirmed as modified. |
| Counsel on Appeal | Michael J. Pelletier, Patricia Mysza, and Ann B. McLennan, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Mary P. Needham, and Hareena Meghani-Wakely, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE McBRIDE delivered the judgment of the court, with opinion.<br>Presiding Justice Burke and Justice Gordon concurred in the judgment and opinion. |

**OPINION**

¶ 1     Following a bench trial, defendant Gregory Sandifer was convicted of first degree murder of his three-year-old son, Jaivon, and attempted first degree murder, aggravated criminal sexual assault, and aggravated domestic battery of M.J., Jaivon's mother. The trial court sentenced defendant to natural life in prison for the murder, a consecutive term of 25 years' imprisonment for attempted murder, and concurrent prison terms of 18 years for sexual assault and 7 years for domestic battery.

¶ 2     On appeal, defendant contends that the trial court erred when it denied his motion to suppress his statements because his severe pain and pain medication administered to him at the time of his statements rendered him unable to knowingly and intelligently waive his *Miranda* rights and make a voluntary statement. Defendant also contends, and the State agrees, that his conviction for aggravated domestic battery must be vacated under the one-act, one-crime rule because it is based on the same physical act as the attempted murder conviction. Finally, defendant argues that his life sentence is excessive because it fails to take into account his nonviolent criminal history. We vacate the aggravated domestic battery conviction and affirm defendant's three remaining convictions and sentences in all other respects.

¶ 3     Defendant was charged with first degree murder, attempted first degree murder, aggravated criminal sexual assault, aggravated kidnapping, aggravated domestic battery, aggravated battery, and aggravated unlawful restraint. Prior to trial, defendant filed a motion to suppress statements he made to police and Assistant State's Attorney (ASA) Karin Sullivan while in custody and undergoing treatment at West Suburban Medical Center. Defendant alleged that due to his medical, mental, and psychological state, he was incapable of understanding and appreciating his *Miranda* rights, and therefore, his statements were not voluntary or knowingly and intelligently made. He specifically noted that he had been given the pain medications morphine and Dilaudid. Defendant argued that his medical condition was so severe that it should have been obvious to the police and the ASA during their conversations. Defendant asserted that all of the statements he made were elicited in violation of his constitutional rights.

¶ 4     At the hearing on defendant's motion, the State called Armita Mabeza Butardo, a registered nurse at West Suburban Medical Center, who testified that on September 2, 2011, defendant was transferred to her unit from the emergency room for treatment of a comminuted fracture to his right ankle, which was broken into pieces. About 4:30 p.m., Butardo conducted an initial mental assessment to determine defendant's levels of consciousness and pain. While in the emergency room, defendant had been given two doses of morphine, one at 12:16 p.m. and the second at 3:12 p.m. Butardo's assessment lasted 30 to 45 minutes, and defendant answered her questions correctly. Butardo determined that defendant was oriented to time, place, and person. He was alert, calm, and showed no signs of confusion, and his vital signs were stable.

¶ 5     Following the assessment, defendant indicated that his level of pain on a scale of 1 to 10 was a 12. At 5:55 p.m., Butardo gave defendant a third dose of morphine. She monitored defendant for any adverse reactions, and after 20 minutes, defendant reported that his pain level had only decreased to a 10. Consequently, at 6:15 p.m., Butardo gave defendant a dose of Dilaudid. She remained with defendant until 7:30 p.m., and during that time, he ate his dinner,

was alert, oriented, and responsive, and showed no signs of confusion. Defendant did not have any adverse reactions to the medications.

¶ 6    Butardo explained that both morphine and Dilaudid are opiates and narcotics that relieve pain by altering the brain's perception of pain and reaction to it. The drugs may decrease a person's respiratory and pulse rates, causing them to feel sleepy. Both medications become effective about five minutes after being administered, and their half-life is two hours, at which time they reduce their level in the blood to half of the initial volume. Dilaudid is the stronger of the two medications and reaches its peak in 20 to 30 minutes, allowing patients to feel better sooner as compared to the morphine. After defendant received the medications, he was not sleepy, his eyes were not closed, and he was responsive to Butardo's questions.

¶ 7    That evening, some police officers asked Butardo if they could question defendant. She advised them that she had given him pain medication, and they then spoke with him. Afterwards, at 10 and 10:45 p.m., Butardo observed that defendant was alert and coherent. At 10:45 p.m., defendant stated that he was still in pain, and Butardo gave him another dose of morphine, after which he remained alert and responsive. Butardo did not observe any change in defendant's mental state after receiving any of the doses of medication. Defendant only complained about pain with his ankle and did not report any other pain.

¶ 8    The State then called Chicago police officer Timothy Adams, who testified that he assumed guard duty over defendant while he was being treated in the emergency room at West Suburban Medical Center. Although defendant remained handcuffed, Adams denied interfering with any medical treatment. He also denied initiating any conversations with defendant about what had happened or why he was in custody.

¶ 9    Between 1:15 and 2:05 p.m., while Adams and defendant were alone in the emergency room, defendant asked the officer several questions about what had happened that day. Adams replied that he did not know what happened and he was only there to keep watch over defendant. The officer did not ask defendant any questions. Defendant remained silent for awhile, then told Adams that he remembered getting into a fight with his girlfriend and getting a knife from the kitchen and stabbing her. Adams could not recall if defendant said that his girlfriend jumped out of the window or was pushed out. Defendant stated that after his girlfriend went out the window, he decided that he was going to kill himself, and he was going to take his son Jaivon with him. While lying in the hospital bed, defendant closed his eyes and made a stabbing motion as though he was reenacting the incident. Adams demonstrated that motion by holding his left hand up at waist level and moving his right hand back and forth with a clenched fist. Adams explained that as defendant made this motion, he smashed his handcuffs against the bedrail in a very forceful motion. Defendant then calmed down and said that he ran out of the apartment and the police took him into custody. Defendant's statement to Adams lasted about 10 to 15 minutes.

¶ 10    When Detective Thomas Kolman arrived at the hospital, Adams told him what defendant had said. Kolman then spoke with defendant with Adams present. Adams denied that defendant appeared confused or disoriented at any time during their interaction. Adams also explained that he did not memorialize defendant's statement in a written report because he waited for Kolman to question defendant. If defendant had changed his story in any way, Adams would have written a report recounting the version defendant had told him. Adams acknowledged that he never advised defendant of his *Miranda* rights.

¶ 11 The State then called Detective Kolman, who testified that when he arrived at the hospital, Officer Adams told him that, while he was guarding defendant, defendant stated that he had stabbed Jaivon and M.J. Kolman spoke with the emergency room nurse to see if he could question defendant about what had occurred that day. Kolman explained that he wanted to know if defendant was medically able to answer questions, if he was medicated, or if he was going to be taken into surgery. About 2:50 p.m., Kolman spoke to defendant with Adams present.

¶ 12 Kolman advised defendant of his *Miranda* rights, and defendant agreed to speak with him. Throughout their conversation, which lasted half an hour, defendant's demeanor and mental status was fine. Defendant's answers were responsive to the questions asked. He did not appear sleepy or confused, nor did he appear to have any trouble understanding the detective.

¶ 13 Defendant told Kolman that he, M.J., and their son, Jaivon, went to Northeastern Illinois University to register M.J. for classes. When they returned to M.J.'s home, defendant and M.J. argued about babysitting duties. The argument escalated into a physical altercation, and defendant shoved M.J. into a front bedroom and ordered Jaivon to go to a rear bedroom. Defendant stated that he threw M.J. down onto the bed, climbed on top of her, and removed her clothing. Defendant then went to the kitchen, retrieved a knife, and returned to the bedroom where he engaged in sexual intercourse with M.J. Defendant stated that he stabbed M.J. once, and they struggled for control of the knife. M.J. gained control of the knife, then went to the living room and threw it out the window. M.J. attempted to leave, but defendant blocked her path and would not allow her to go. M.J. then went to the same window where she had thrown out the knife and tried to go out the window. Defendant either threw a television at her or shoved a television into her. M.J. then jumped out the window and landed on the concrete below.

¶ 14 Defendant told Kolman that at some point, Jaivon entered the living room and witnessed a portion of the fight. Defendant retrieved a second knife intending to commit suicide and decided that he would take Jaivon with him. Defendant stabbed Jaivon with the knife in the foyer and dropped that knife. Defendant retrieved a third knife and exited the apartment through the back door onto a porch. After observing dogs in the yard, defendant jumped into the neighbor's yard and injured his ankle. Defendant then walked into the alley, entered an open garage, and hid inside that garage until he was confronted by the owner. At that same moment, the overhead garage door opened, and the police took him into custody. During this interview, defendant never complained about any pain or his physical condition, nor did he ever state that he wanted to terminate the conversation.

¶ 15 About 7:30 p.m., Kolman returned to the hospital with Detective John Fuller, and after meeting with ASA Sullivan, the three of them went to defendant's room. Before entering, they spoke with nurse Butardo to see if defendant was still able to understand and answer their questions. About 7:56 p.m., they entered the room, and Sullivan advised defendant of his *Miranda* rights. Defendant appeared to be fine and agreed to speak with them. He was no longer wearing handcuffs. Defendant answered the questions in a conversational manner and did not appear to be sleepy or confused. His answers were responsive to their questions, and Kolman had no concerns about defendant's mental status during this interview, which lasted 35 to 40 minutes.

¶ 16 Defendant retold his story of what had occurred, which was substantially the same as the statement he earlier gave to Kolman. Defendant added that he was angry about M.J. going out

with her friends, going to the gym, and leaving him to watch Jaivon. Defendant said that M.J. made fun of him and talked down to him, and he became "very, very angry with her." M.J. also told defendant that he should take Jaivon to his house. Defendant said that was when he became angry and pushed M.J. into the bedroom. During this interview, defendant recalled stabbing M.J. several times. M.J. broke free from defendant and said that she would not call the police, but he did not believe her. Defendant said that he gave M.J. the knife hoping that she would stab him, but instead, she threw it out the window.

¶ 17 Defendant also added that M.J.'s remark about taking Jaivon with him stuck in his head, and he decided to take Jaivon with him by killing him and committing suicide. Defendant stated that he stabbed Jaivon numerous times. He added that when the neighbor confronted him inside the garage, defendant hid the knife and drank a soda that he found inside a refrigerator. At some point, defendant stated that M.J. hit him in the face or head with a hammer but then said that he was not sure if the object was a hammer.

¶ 18 Following this interview, defendant agreed to give a videotaped statement, which was recorded about 9:33 p.m. Kolman testified that defendant was fine at this time, and there was no change in his demeanor or mental status.

¶ 19 On cross-examination, Kolman stated that the interview was a combination of defendant answering questions and providing his own answers in a narrative. He acknowledged that both the emergency room nurse and nurse Butardo told him that defendant was taking pain medication. Kolman testified that during the first two interviews, defendant spoke in a normal tone and his eyes were open. He acknowledged, however, that during the videotaped interview, there were a couple of occasions where defendant's eyes appeared to close and ASA Sullivan asked defendant to open his eyes. Kolman explained that defendant seemed a bit more fatigued at the time of the video statement, but he was still cognizant in answering questions, even with his eyes closed.

¶ 20 The State presented defendant's videotaped statement, which the trial court admitted into evidence. The court then continued the case so that it could view the video before ruling on defendant's motion. On the next court date, the court stated that it had viewed the video "not for the purposes of what actually was said in the video, but to observe whether or not Defendant's actions were voluntary on the night in question."

¶ 21 The court found that during the first interaction, when defendant made statements to Officer Adams, defendant "spontaneously" stated what he believed had occurred and made those statements voluntarily. The court then stated:

"This case really comes down to the voluntariness of the Defendant's statement in question. There's no question as I watched the video where I could personally observe the Defendant that he had discomfort, he was in pain during portions of this. His eyes, at times, were closed. The State's Attorney prompted him to open his eyes, did give an explanation at one point that it helped him by keeping his eyes closed to visualize what he was talking about.

Also indicate [*sic*] in the very beginning of the video, with the State's Attorney, he was extremely quiet. It was difficult to hear him. I had to adjust my volume several times. But when he got to that portion of his statement which reference to the actual act of being with his son, he was—the volume was substantial, substantially different than what the initial interview occurred.

The State's Attorney, Ms. Sullivan, was moving through the interview, attempting to get yes and no answers, and the Defendant wasn't letting her get away with yes or no answers. He added great detail to many of the questions that she asked him at that point.

And finally, when asked about what he thought about the influence of the drugs that he was taking, he said he thought the drugs were making him talk faster.

Although I recognize he was in discomfort, I recognize he was taking drugs, I don't find that the statement was anything other than voluntary, on the night in question. Motion to suppress is denied."

¶ 22 At trial, M.J. testified that she and defendant began dating in February 2006 and had a "very rocky" relationship. In March 2007, defendant punched M.J. in the face, giving her a black eye. M.J. initially pressed charges but dropped the charges when she learned she was pregnant. Their son Jaivon was born in November 2007, and in 2008, M.J. and Jaivon moved in with defendant. They lived together until their relationship ended in November 2010. M.J. and Jaivon then moved into her mother's second-floor apartment. Defendant had no contact with M.J. and Jaivon until March 2011, at which time they resumed contact, but not a romantic relationship.

¶ 23 In late July 2011, defendant began helping take care of Jaivon by taking him to and from school. M.J. allowed defendant to occasionally stay overnight at her mother's apartment. When he did, defendant would stay in a separate bedroom from M.J. and Jaivon. On September 1, 2011, defendant stayed overnight.

¶ 24 The following morning, M.J., defendant, and Jaivon went to Northeastern Illinois University where M.J. was enrolled in school. When they returned to her mother's apartment about 10 a.m., M.J.'s friend called on the phone, and M.J. agreed to go to a gym with her. While M.J. prepared to go, defendant asked her where she was going. M.J. replied that he did not have to worry about where she was going because they were no longer together. Defendant grabbed M.J.'s arm, and she punched him in the face and told him to get off of her. M.J. then went to her bedroom to get her workout clothes.

¶ 25 As M.J. exited her bedroom, defendant pushed her onto her bed. He left her room for a brief moment, then returned, pushed her back onto the bed, and locked the bedroom door. M.J. observed that defendant was holding a butcher knife from the kitchen in his hand. Defendant told M.J. that she was either going to give it to him, or he was going to take it. He got on top of M.J. and ripped off her shorts and underwear. Defendant pulled down his shorts and underwear and inserted his penis into her vagina. M.J. tried to push defendant off of her but was unsuccessful. Defendant then stabbed M.J. in her upper left arm, left shoulder, and right arm. M.J. pleaded with defendant to stop and said she loved him to try to prevent him from stabbing her again. M.J. could hear Jaivon yelling and running back and forth in the apartment. M.J. broke free from defendant, and when she went to the bedroom door, he stabbed her on the side of her neck.

¶ 26 M.J. exited the bedroom and entered the living room where Jaivon was sitting on the couch. Defendant fell as he followed M.J. into the living room. M.J. tried to wrestle the knife away from defendant, and he stabbed her in her left breast. M.J. wrestled the knife away from defendant and tried to exit the front door of the apartment, but it was locked. She threw the knife out the living room window. Defendant then threw a television at M.J. M.J. straddled the open window as defendant repeatedly punched M.J. in the face. Defendant then pushed M.J. out the window, and she fell to the ground.

¶ 27    M.J., wearing only a ripped top and her bra, ran into the street and yelled that defendant was going to kill her baby. She flagged down a police officer and was subsequently taken to "Cook County Hospital," where medical personnel treated her injuries and conducted a sexual assault evaluation. As a result of her injuries, M.J. has scars on her arms, shoulder blade, neck, and breast.

¶ 28    M.J. identified several photographs of her apartment, including her bed with bloody sheets and bloodstains where she leaned against the wall as she tried to exit the front door. M.J. also identified photos of a bloodstained knife on the kitchen counter, a bloodstained knife on the kitchen floor, and bloodstains on the kitchen floor that were not there when she went out the window.

¶ 29    Randy Johnson was walking across Division Street when he observed that the blinds in the second-floor window of the building next to his were moving very fast. As he got closer, he observed a woman in the window engaged in a fight with a man who was holding a knife. The man was not wearing a shirt, and the woman's clothes were ripped and bloody. It appeared that the woman was trying to escape and defending herself from being stabbed. Johnson ran toward the window and shouted at the man to leave the woman alone. The fighting stopped for a minute, then the woman opened the window and jumped out. At that same time, Johnson saw a butcher knife fall from the window. The woman landed at Johnson's feet and bounced up. She was barely clothed, and the clothes she wore were ripped and bloody. The woman appeared terrified and ran into Division Street. Two days later, Johnson identified defendant in a photo array.

¶ 30    Christopher Ferguson, a funeral director, testified that at 11 a.m. on September 2, he was hosting a funeral service inside a church on Division Street. As he looked out the window, he observed a young woman coming out of a second-floor window of a residence across the street. He then observed defendant behind the woman with a knife and saw him stabbing her in her shoulder and neck. Ferguson and a few other people ran out of the church and across the street in an attempt to stop the attack. As they did so, the woman fell from the window to the ground. She then jumped up and ran into the middle of Division Street. Ferguson flagged down a police officer and sat the woman down, who was bleeding. Based on her statements, Ferguson realized that there was a baby inside the house. Officer Jackson entered the building while Ferguson remained outside. Ferguson observed a knife on the grass outside the building. A short time later, Officer Jackson brought Ferguson to the area where defendant was detained, and Ferguson identified him as the man from the window.

¶ 31    Chicago police officer Matthew Jackson testified that at 11 a.m. on September 2, he was driving westbound on Division Street when he observed a hysterical woman, whom he later learned was M.J., run into the street. She was bloody, and her top was torn. She approached the vehicle and told Jackson that she had been fighting with her boyfriend, defendant, who threw her out the window at knifepoint. She also said that her baby was inside the apartment, and she was afraid that defendant was going to kill him. When Jackson approached the building, he observed a large kitchen knife lying on the grass next to the pavement.

¶ 32    Officer Jackson ran upstairs to the second-floor apartment and, after getting no response, kicked the door open and entered the unit with his gun drawn. He observed defendant standing at the back of the unit, holding a knife in his right hand. Defendant did not comply when ordered to drop the knife and went to his left, out of the officer's sight. Jackson ran down the hallway into the kitchen where he observed the knife, bowed and bloody, lying on the kitchen

counter. He then observed defendant standing on the rear porch and heard dogs barking in the backyard. Jackson made eye contact with defendant and ordered him to stop. Defendant immediately jumped from the second-floor porch and landed in the backyard of the residence next door. While doing so, the lower part of defendant's body hit a wooden fence, breaking some pickets. Defendant then hobbled past a garage and out Jackson's sight.

¶ 33 Jackson returned inside the apartment and heard convulsions and a murmuring sound. He found Jaivon in the first bedroom, lying on his side on the floor adjacent to the bed. Jaivon was "decapitated" from a cut to the back of his neck and was bleeding profusely. He also had puncture wounds on his shoulders, chest, and arms. Jackson grabbed Jaivon by his body and neck, and when he turned him, Jaivon's head literally fell from his neck. Jaivon was still experiencing convulsions and gurgling with blood coming from his neck. Jackson ran outside, grabbed a paramedic who was tending to M.J., and brought the paramedic to Jaivon. The paramedic immediately carried Jaivon to the dining room, cleared the table with one sweep of her hand, and started working on him. A short time later, Jackson went to the alley behind the building and identified defendant as the offender inside the apartment.

¶ 34 The State then published a police observation device video that recorded the activity on Division Street. As the video played, Jackson narrated what occurred after he was flagged down.

¶ 35 Deammie McGee testified that, on September 2, he was living with his aunt at 5035 West Crystal Street, which is the street north of Division Street. Shortly after 11 a.m., he observed their garage door open. He entered and observed defendant lying on the floor. McGee asked defendant what he was doing, and defendant claimed he lived there. McGee replied, "[N]o, I live here." McGee alerted his aunt, who came out to the garage. McGee flagged down a police officer and told her that a young man was hiding in their garage. McGee's aunt was yelling at defendant and opened the garage door.

¶ 36 Chicago police officer Denise Oswald responded to a call for assistance with a battery offender in the rear of 5038 West Division Street shortly after 11 a.m. As she drove through the alley, she saw an individual jump over a fence. She exited her vehicle and heard a commotion inside a garage. The garage door opened, and Oswald saw an elderly woman yelling at defendant, telling him to get out of her garage and that he had damaged her car. Defendant was sweating and had blood on his hands up to his mid-arms. He was trying to open a refrigerator door and got blood all over the door. Oswald told defendant to stop and show her his hands. He closed his eyes and responded, "I'm tired, I'm thirsty, I've been fighting." As he said the word fighting, defendant made fists with both of his hands and moved them back and forth. Oswald also observed cans of soda all over the floor. Oswald handcuffed defendant and asked him to walk with her, at which time he said his leg was injured.

¶ 37 Officer Adams rode in the ambulance that transported defendant to the hospital and guarded defendant while he was being treated in the emergency room. Adams informed the physicians and nurses that a crime had occurred and that he needed defendant's clothing as evidence.

¶ 38 Officer Adams's testimony regarding defendant's statement was substantially the same as his testimony from the suppression hearing. Adams recounted defendant's statement that he stabbed M.J. with a knife. Adams also described how defendant reenacted the stabbing of Jaivon, violently striking his handcuffs against the bed railing. Adams added that defendant's portrayal of the act was "quite violent." Adams denied asking defendant any questions and

responded to all of defendant's questions by saying that he did not know. Adams testified that he was present when Detective Kolman advised defendant of his *Miranda* rights and defendant retold his story.

¶ 39    Detective John Fuller arrived at 5038 West Division Street about 11:45 a.m. and was directed to a knife and blood on the ground outside the building. Defendant was detained in the alley behind the residence and was being treated by paramedics. Detective Fuller entered the second-floor apartment and observed signs of a violent struggle, including numerous items strewn about the floor and a large television on the floor near the windows.

¶ 40    Fuller later went to West Suburban Medical Center with Detective Kolman and met with ASA Sullivan. Fuller spoke with nurse Butardo to determine defendant's condition, whether or not he was capable of communicating with them, and whether it was medically advisable to speak with him. Defendant was responsive to their questions and statements, appeared to understand what was happening, and did not appear confused.

¶ 41    Fuller testified to the details of defendant's statement, which was substantially the same as Detective Kolman's testimony from the suppression hearing. Fuller added that defendant said he tried to restrain M.J. from falling through the window when her shirt ripped and she fell to the ground. He also added that defendant said he stabbed Jaivon in the threshold of the kitchen, and Jaivon then walked to the front bedroom. Defendant said he placed the knife he used to kill Jaivon on the kitchen counter.

¶ 42    Pediatrician Joy Marie Koopmans was working at the Cook County Trauma Unit when Jaivon arrived by ambulance. Attempts to resuscitate Jaivon were unsuccessful, and he was pronounced dead. Koopmans was also asked to assist in the medical treatment of M.J. and completed a criminal sexual assault evidence collection kit on her.

¶ 43    The State presented a stipulation that deputy medical examiner Lauren Moser performed an autopsy on Jaivon and found multiple incised and stab wounds on his body. Jaivon had multiple incised wounds to his neck, one of which was a gaping wound that was 4 inches long by 1½ inches wide and 1 inch deep. He also had three stab wounds to his back, which injured both of his lungs, his liver, the hepatic vein, and inferior vena cava and fractured a rib. Additional wounds included three stab wounds to the left side of his chest, a stab wound to his left shoulder, two through-and-through incised wounds to his left arm, a cluster of incised wounds to his left elbow, two incised wounds to his left forearm, a stab wound to his left forearm, and incised wounds to his shoulder, right thigh, right leg, left wrist, and left hand, which exposed the underlying tendons. Moser opined that Jaivon's cause of death was multiple stab and incised wounds, and the manner of death was homicide.

¶ 44    Edward Tomasik, a forensic investigator with the Chicago police department, processed the crime scene. He recovered three knives: a 13-inch knife with an 8-inch blade containing blood from the kitchen countertop, a 13-inch knife with an 8-inch blade from the kitchen floor, and a knife in front of the building. He also recovered several items of bloody clothing from the front bedroom. Tomasik went to the hospital and took swabs of red stains from defendant's right hand and possession of defendant's clothing. He also photographed Jaivon and M.J., and recovered clothing from M.J.

¶ 45    Keman Hasanbegovic, a forensic scientist for the Illinois State Police, testified that the swabs taken from defendant's right hand tested positive for blood. All three of the knives recovered in this case also tested positive for blood, and the blades of the two knives recovered

from the kitchen were bent. Defendant's T-shirt, shorts, and gym shoes also tested positive for blood. In addition, the vaginal and anal swabs taken from M.J. tested positive for semen.

¶ 46    Jennifer Belna, a forensic scientist for the Illinois State Police, found that Jaivon's DNA matched the blood on both of the knives recovered from the kitchen and the blood on a piece of defendant's T-shirt. M.J.'s DNA matched the blood on the knife recovered outside the building and blood on the handles of both of the knives recovered from the kitchen. M.J.'s DNA also matched the blood on defendant's T-shirt, shorts, and shoes, as well as the swabs taken from his right hand. Defendant's DNA matched the blood on the knife recovered from the kitchen floor and partially matched the blood on the handle of the knife recovered outside the building. Belna also found that the vaginal swabs taken from M.J. matched the DNA of M.J. and defendant.

¶ 47    The State presented stipulations that Detective Kolman and nurse Butardo would testify the same as they did at the hearing on defendant's motion to suppress. The State presented another stipulation that a fingerprint found on the knife recovered outside the building did not match defendant.

¶ 48    Defendant presented a stipulation that Detective Kolman would testify that he interviewed M.J. on September 2, and she told him that when she began climbing out the window, defendant pulled her back. She also stated that defendant had her by her shirt, but it ripped, at which time she fell.

¶ 49    Finding the evidence "absolutely overwhelming as to defendant's guilt," the trial court found defendant guilty of the first degree murder of Jaivon. As to M.J., the court found defendant guilty of attempted first degree murder, aggravated criminal sexual assault, aggravated domestic battery, aggravated battery, and aggravated unlawful restraint. The court found defendant not guilty of aggravated kidnapping.

¶ 50    Defendant filed a motion for a new trial alleging, *inter alia*, that the trial court erred when it allowed Officer Adams to testify about defendant's statements at the suppression hearing and at trial because Adams did not document those statements and they were not disclosed to the defense until two days prior to the suppression hearing. Defendant's motion did not allege that the court erred when it denied his motion to suppress the statements. The trial court denied the motion.

¶ 51    At sentencing, M.J. and her mother, Betty J., read their victim impact statements describing their pain due to Jaivon's murder. M.J. also asked that justice be served for Jaivon and herself. The State presented a certified copy of defendant's birth certificate showing his date of birth as December 30, 1983.

¶ 52    Defendant's uncle, Victor Agee, read a statement on behalf of defendant's family, initially stating that they did not condone the killing of Jaivon or defendant's "horrific attack" of M.J., and extending their sympathy to her and her family. Agee expressed the family's pain at the loss of Jaivon and stated that they were "appalled by this atrocity." He further stated that the family was certain that there were circumstances that contributed to the "intense evil and dark act" committed by defendant. Agee explained that defendant lost one brother to gang violence, another brother to suicide, and his father to cancer. Defendant had difficulty adjusting to the loss, suffered "acute depression," and was advised by family members to seek counseling. Agee characterized defendant as a caring young man with goals and dreams who was taught Christian values and respect for others. Defendant was employed until he became too depressed to effectively work during the six months prior to the murder and lost his ability to

handle the everyday stresses of life. The family requested that defendant be placed where he would receive psychological treatment so that he could remit his actions with rehabilitation and in some way prevent others from going to a deep place of depression and rage.

¶ 53    The State pointed out that it previously filed a notice of intent to seek natural life imprisonment based on the fact that defendant murdered a child, that he acted with intent to kill the child, and that he committed the murder during the course of another inherently violent felony. The State also requested an extended-term sentence for the aggravated criminal sexual assault, in addition to sentences for the attempted first degree murder and aggravated domestic battery of M.J.

¶ 54    In aggravation, the State argued that a sentence of natural life imprisonment was appropriate in this case in order to achieve some measure of justice for Jaivon, which M.J. requested in her victim impact statement. The State noted that M.J. will spend the rest of her life wondering what Jaivon's last thoughts were and the terror that he felt. The State further argued that M.J. was also entitled to justice for what defendant did to her and requested that the sentences for those offenses be nowhere near the minimum terms and closer to the maximum ends of the sentencing ranges. The State pointed out that Jaivon was present in the apartment when defendant raped and stabbed his mother and while M.J. tried to escape, spreading blood everywhere. The State further argued that it was absolutely appropriate and not a legal nullity to sentence defendant to a term that was consecutive to a natural life sentence. The State argued that justice demanded consecutive sentences in this case because defendant deserved the consequences of what he brought upon himself. The State remarked that Agee's statement on behalf of defendant's family was very powerful and correct. The State repeatedly stated that there was no explanation for what defendant did and that defendant had no justification for raping M.J. and for "slaughtering his child."

¶ 55    In mitigation, defense counsel argued that there was nothing she could say about defendant that his uncle had not already said. Counsel noted that the court had been tendered additional letters from defendant's family and friends on the last court date and that they knew defendant better than she. Counsel stated that she could not explain what happened that day with defendant or why it happened. Counsel pointed out that the court had the presentence investigation report (PSI) and specifically noted that defendant did not have a violent background and was not a violent person. Counsel stated that two families lost Jaivon and that she had gotten to know defendant's family over the past three years, and it was a good and close family. Counsel asked that the court not sentence defendant to natural life and, instead, to impose a term of years. Defendant declined to make a statement in allocution. Defendant's PSI indicates that he had three prior drug convictions.

¶ 56    The trial court stated that it reviewed its notes from the trial and that the trial was very fresh in the court's mind. The court further stated that it reviewed the information contained in the PSI and gave consideration to the impact statements made by both families, as well as the arguments from counsel. The court then stated:

    "Mr. Sandifer, I have been doing this a long time, and unfortunately in many cases we come a little hardened in how we handle cases. This case was not that situation. When it comes to children, things are much, much different. It was clear to me as this trial progressed, as I looked at both sides of the aisle, you came from a great family. It's not easy for your family to show up in a situation based upon the facts of this case. They did. There are very strong family ties in this matter, but your actions in this case

are absolutely inexplicable to this Court. I had no idea how any father could do that to his son.

As to Count 1, first degree murder, I find the appropriate sentence in this case to be the rest of your natural life."

The court sentenced defendant to a consecutive term of 25 years' imprisonment for the attempted first degree murder of M.J. and concurrent prison terms of 18 years for aggravated criminal sexual assault and 7 years for aggravated domestic battery. The aggravated battery and aggravated unlawful restraint convictions were merged. Defendant's motion to reconsider the sentence was denied.

¶ 57    On appeal, defendant first contends that the trial court erred when it denied his motion to suppress his statements because his severe pain and the pain medication administered to him at the time of his statements rendered him unable to knowingly and intelligently waive his *Miranda* rights and make a voluntary statement. Defendant claims that the videotaped statement demonstrates that he was experiencing cognitive impairment during the interrogations. Defendant argues that, although the police testified that he was oriented and not confused, their testimony does not show that he had the cognitive ability to understand his rights. He further argues that the admission of the statements was not harmless error because they were "devastating" to his case.

¶ 58    Defendant acknowledges that he did not properly preserve this issue. He argues, however, that his forfeiture should be overlooked because the trial court fully considered the issue at the hearing on his motion to suppress. Alternatively, he asserts that the issue should be considered under the second prong of the plain error doctrine and that his trial counsel rendered ineffective assistance because she failed to preserve the issue.

¶ 59    The State responds that defendant forfeited the issue and that the plain error doctrine does not apply because the trial court did not err when it admitted his voluntary statements. The State argues that *Miranda* warnings were not required for defendant's statements to Officer Adams because they were not made during an interrogation, but instead, were made spontaneously and voluntarily of his own free will. The State further argues that defendant's three subsequent statements were voluntarily and knowingly made after defendant was advised of his *Miranda* rights. The State asserts that the mere fact that defendant was in pain and taking medication did not fatally undermine his ability to give his voluntary statements where the record shows that he was alert and responsive, showed no signs of confusion, and provided detailed answers to open-ended questions. Alternatively, the State argues that if any error occurred in admitting the statements, it was harmless because the evidence against defendant was overwhelming.

¶ 60    To preserve an issue for appeal, defendant must make an objection at trial and raise the issue in a written posttrial motion. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). Defendant acknowledges that he did not fully address the issue in his motion for a new trial.

¶ 61    Although not raised by the parties, this court may address the issue by applying an exception to the forfeiture rule. Our supreme court has held that an exception exists for constitutional issues that were properly raised at trial that may be raised later in a postconviction petition. *People v. Cregan*, 2014 IL 113600, ¶ 16 (citing *Enoch*, 122 Ill. 2d at 190). The primary basis for this exception is judicial economy. *Id.* ¶ 18. The *Cregan* court reasoned that if a defendant was precluded from raising a constitutional issue previously raised at trial on direct appeal, merely because he failed to raise it in a posttrial motion, he could

simply raise the issue in a subsequent postconviction petition. *Id.* "Accordingly, the interests in judicial economy favor addressing the issue on direct appeal rather than requiring defendant to raise it in a separate postconviction petition." *Id.*

¶ 62 Here, defendant's motion to suppress his statements as involuntary asserts a violation of his constitutional rights. We therefore find that the constitutional-issue exception applies because defendant raised the issue at trial and could have raised it in a subsequent postconviction petition. Accordingly, we address the issue in this appeal.

¶ 63 The trial court's ruling on a motion to suppress statements presents questions of both fact and law. *People v. Richardson*, 234 Ill. 2d 233, 251 (2009). The court's factual findings and credibility determinations will not be disturbed on review unless they are against the manifest weight of the evidence. *Id.* We afford great deference to the trial court's factual findings because it was in the superior position to determine and weigh the credibility of the witnesses, observe the demeanor of the witnesses, and resolve conflicts in their testimony. *Id.* The court's ultimate finding of voluntariness is a question of law that we review *de novo*. *People v. Hughes*, 2015 IL 117242, ¶ 32. In reviewing the trial court's ruling on a motion to suppress, we may consider the evidence adduced at trial as well as the suppression hearing. *Richardson*, 234 Ill. 2d at 252.

¶ 64 The test for voluntariness is whether the defendant made his statements freely and voluntarily, without any kind of compulsion or inducement, or whether his will was overborne at the time of his confession. *Hughes*, 2015 IL 117242, ¶ 31. If his will was overborne, the defendant's confession cannot be considered the product of a rational intellect and free will. *People v. Kincaid*, 87 Ill. 2d 107, 117 (1981).

¶ 65 In determining whether a confession is voluntary, the court must consider the totality of the circumstances by weighing several factors including the defendant's age, experience, background, intelligence, education, mental capacity, and his physical condition at the time of questioning. *Hughes*, 2015 IL 117242, ¶ 31. Additional factors include whether *Miranda* warnings were given, the legality and duration of the detention, the duration of the questioning, and any mental or physical abuse by police, including threats or promises. *Richardson*, 234 Ill. 2d at 253-54. In order to be valid, the defendant's waiver of his *Miranda* rights must have been knowingly and intelligently made with a basic understanding of what those rights encompass and the likely consequences of his waiver. *People v. Braggs*, 209 Ill. 2d 492, 514-15 (2003). It is the State's burden to establish that the defendant's confession was voluntary by a preponderance of the evidence. *Hughes*, 2015 IL 117242, ¶ 31.

¶ 66 The fact that a defendant was under the influence of drugs, self-administered or otherwise, when he made a confession does not render the confession automatically inadmissible. *Kincaid*, 87 Ill. 2d at 119. However, a confession that was, "*in fact*, induced by the administration of a drug" is involuntary, and therefore, not admissible into evidence. (Emphasis in original.) *Id.* at 117. The practical effect of such circumstances is to overcome the will of the accused by lowering his ability to resist suggestions, subtle threats, or promises by interrogators. *Id.* A confession obtained in such manner thereby violates due process. *Id.*

¶ 67 This court has viewed the video of defendant's statement. After doing so, we question defendant's ability to knowingly waive his *Miranda* rights and render a confession that was truly voluntary given his injury, the excruciating pain he was experiencing, and the level of medication he had received.

¶ 68    The video shows defendant lying in his hospital bed with ASA Sullivan sitting next to him, conducting the interview. Defendant speaks very softly during much of the interview, and Sullivan has to ask him to speak louder. Defendant closes his eyes several times, and Sullivan asks him to open them. The video clearly shows that defendant is suffering an enormous amount of pain from his shattered ankle, and he tells Sullivan that his leg hurts. Sullivan acknowledges that defendant had been given pain medication and asks him if the medication was affecting his understanding. Defendant replies "no, it just make me want to speed it up more, talk a little faster." At the end of the video, Sullivan asks defendant if there is anything more he would like to say. Defendant replies "no, I just want more pain medicine."

¶ 69    The record shows that at the time of the videotaped statement, defendant had received three doses of morphine and one dose of Dilaudid for his pain. The dose of Dilaudid, the stronger of the two medications, was administered after defendant complained that the morphine had not significantly reduced his level of pain. Earlier in the evening, defendant indicated that his level of pain on a scale of 1 to 10 was a 12, and after taking the Dilaudid, his pain level only decreased to a 10.

¶ 70    While we find nothing improper about the questioning by the police or the ASA, given the fact that, at the time of the videotaped statement, defendant was suffering a tremendous amount of excruciating pain from his shattered ankle and that he had received multiple doses of strong pain medication, we find that he was not in a position to voluntarily confess. Therefore, based on this record, the trial court's determination that defendant's statement was voluntary was against the manifest weight of the evidence. Accordingly, the court erred when it denied defendant's motion to suppress the statement.

¶ 71    Nevertheless, in light of the overwhelming evidence of defendant's guilt, even without the videotaped statement, we find that the admission of the statement was harmless error. The United States Supreme Court has held that the admission of an involuntary confession at trial is subject to harmless error analysis. *Arizona v. Fulminante*, 499 U.S. 279, 303 (1991). In analyzing that holding, the Illinois Supreme Court noted that the *Fulminante* Court determined that the admission of an involuntary statement or confession was " 'similar in both degree and kind to the erroneous admission of other types of evidence' " and therefore was a trial error subject to harmless-error review. *People v. Wrice*, 2012 IL 111860, ¶ 67 (quoting *Fulminante*, 499 U.S. at 310). The *Wrice* court further noted that "Chief Justice Rehnquist distinguished *Fulminante* from cases involving physical coercion, stating that application of harmless error is 'especially true in a case such as this one *where there are no allegations of physical violence on behalf of the police*.' " (Emphasis in original.) *Id.* ¶ 72 (quoting *Fulminante*, 499 U.S. at 311). Based on the holding in *Fulminante*, the *Wrice* court "recast" the rule in Illinois to provide that "use of a defendant's *physically* coerced confession as substantive evidence of his guilt is never harmless error." (Emphasis in original.) *Id.* ¶ 71.

¶ 72    In this case, defendant's claim of involuntariness is based upon multiple doses of pain medication he was given and the intense pain he was suffering from as a result of an ankle that was "broken into pieces." There is no claim by defendant of any form of police coercion, physical or otherwise. We emphasize our earlier finding that the police did nothing improper in this case. Accordingly, we can apply a harmless-error review.

¶ 73    The test for determining whether a constitutional error is harmless is whether it appears beyond a reasonable doubt that the error did not contribute to the verdict. *People v. Patterson*, 217 Ill. 2d 407, 428 (2005). Under this test, there are three different approaches for measuring

an error: (1) focus on the error to determine if it contributed to the conviction, (2) analyze the other evidence in the case to determine if there is overwhelming evidence that supports the conviction, and (3) determine if the improperly admitted evidence is merely cumulative or duplicates evidence that was properly admitted. *Id.*

¶ 74     Here, even without defendant's videotaped statement, the record reveals that the overwhelming evidence supports his convictions. M.J. testified that defendant ripped off her clothes and sexually assaulted her while holding a butcher knife in his hand. He then stabbed her multiple times, punched her in the face, threw a television at her, and pushed her out of the second-floor window. M.J. also testified that Jaivon was in the apartment. Several photographs depicted bloody sheets on the bed, bloodstained knives in the kitchen, and bloodstains throughout the apartment, some of which were not there when M.J. went out the window.

¶ 75     In addition, two eyewitnesses, Johnson and Ferguson, testified that they saw defendant stabbing M.J. in the window, then saw her fall from the window. Johnson also saw a butcher knife fall from the window, and Ferguson and Officer Jackson saw that knife lying in the grass. Officer Jackson entered the apartment and saw defendant standing at the back of the unit holding a knife in his hand. Jackson observed defendant flee from the apartment by jumping into the yard next door. Jackson then found Jaivon in the front bedroom bleeding profusely with numerous stab wounds about his body. Defendant was found hiding inside a neighbor's garage with blood on his hands up to his mid-arms. The medical examiner found multiple stab and incised wounds on Jaivon's body and determined that his manner of death was homicide.

¶ 76     In addition to the testimony, the physical evidence included three bloodstained knives recovered at the scene—two in the kitchen and one outside the building. There was also an abundance of DNA evidence, which indicated that Jaivon's blood was on defendant's shirt and both of the knives recovered from the kitchen. M.J.'s blood was on defendant's clothes, shoes, and hands and the knife recovered outside the building. Defendant's DNA was on the knife found outside the building, one of the knives in the kitchen, and on the vaginal swabs taken from M.J.

¶ 77     In light of this overwhelming evidence of defendant's guilt, we find that even without his recorded statement, the evidence strongly supported his convictions. We therefore conclude that the admission of his statement was harmless error. Based on our conclusion, we need not address any of defendant's prior statements as the voluntariness of those statements would also be subject to harmless error and thus moot.

¶ 78     Defendant next contends, and the State agrees, that his conviction for aggravated domestic battery must be vacated under the one-act, one-crime rule because that conviction and his attempted murder conviction are both based on the same single physical act of defendant stabbing M.J. with a knife. See *People v. Johnson*, 237 Ill. 2d 81, 97 (2010) (where defendant is convicted of two offenses based on the same single physical act, the conviction for the less serious offense must be vacated). Pursuant to our authority (Ill. S. Ct. R. 615(b)(1)); *People v. McCray*, 273 Ill. App. 3d 396, 403 (1995)), we vacate defendant's conviction and sentence for aggravated domestic battery and direct the clerk of the circuit court to amend the mittimus to reflect this modification.

¶ 79     Finally, defendant concedes that he met the statutory requirements for a sentence of natural life imprisonment but contends that such sentence is excessive because the trial court failed to give consideration to the nonviolent nature of his limited criminal history. Defendant also argues that the court failed to give any consideration to his potential for rehabilitation, or the

- 15 -

fact that he committed the offense during a time when he was experiencing psychological turmoil and depression. Defendant requests that this court reduce his sentence to a term of years.

¶ 80    A defendant convicted of first degree murder may be sentenced to a term of natural life imprisonment when the murdered individual was killed during the course of another felony if the individual was actually killed by the defendant, the defendant acted with the intent to kill the murdered individual or with the knowledge that his acts created a strong probability of death, and the other felony was an inherently violent crime, including aggravated criminal sexual assault. 730 ILCS 5/5-8-1(a)(1), (b) (West 2010); 720 ILCS 5/9-1(b)(6) (West 2010). The trial court has broad discretion in imposing an appropriate sentence, and where, as here, that sentence complies with the statutory requirements it will not be disturbed on review absent an abuse of discretion. *People v. Jones*, 168 Ill. 2d 367, 373-74 (1995). An abuse of discretion exists where a sentence is at great variance with the spirit and purpose of the law or is manifestly disproportionate to the nature of the offense. *People v. Alexander*, 239 Ill. 2d 205, 212 (2010).

¶ 81    The Illinois Constitution mandates that criminal penalties be determined according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship. Ill. Const. 1970, art. I, § 11; *People v. Ligon*, 2016 IL 118023, ¶ 10. In light of these objectives, "the trial court is charged with fashioning a sentence based upon the particular circumstances of the individual case, including the nature of the offense and the character of the defendant." *People v. Fern*, 189 Ill. 2d 48, 55 (1999). The court's sentencing decision is entitled to great deference because, having observed the defendant and the proceedings, it had the opportunity to weigh defendant's demeanor, credibility, general moral character, mentality, habits, social environment, and age. *Alexander*, 239 Ill. 2d at 213. "The sentencing judge is to consider 'all matters reflecting upon the defendant's personality, propensities, purposes, tendencies, and indeed every aspect of his life relevant to the sentencing proceeding.' " *Fern*, 189 Ill. 2d at 55 (quoting *People v. Barrow*, 133 Ill. 2d 226, 281 (1989)).

¶ 82    We presume, absent evidence to the contrary, that the trial court gave consideration to the mitigating evidence that was presented. *People v. Burton*, 184 Ill. 2d 1, 34 (1998). Moreover, the trial court need not give defendant's potential for rehabilitation greater weight than the seriousness of the offense, which is the most important factor in determining a sentence. *People v. Gordon*, 2016 IL App (1st) 134004, ¶ 52.

¶ 83    Here, we find no abuse of discretion by the trial court in sentencing defendant to a term of natural life imprisonment, which complied with the statutory requirements. The trial court expressly stated that it reviewed the information contained in defendant's PSI, which indicates that his criminal history was comprised of three prior drug convictions. Defense counsel also argued in mitigation that defendant did not have a violent background and was not a violent person. Therefore, the court was aware that defendant had a limited criminal history that consisted of the nonviolent drug convictions.

¶ 84    The court also stated that it gave consideration to the impact statements made by both families at the sentencing hearing. In his statement, defendant's uncle explained that defendant had difficulty adjusting to the loss of his two brothers and his father and that defendant suffered from "acute depression," which rendered him unable to maintain employment. He stated that family members had advised defendant to seek counseling. Defendant's uncle also stated that defendant had lost his ability to handle the everyday stresses of life, and requested that

- 16 -

defendant be placed somewhere where he could receive psychological treatment. The record thus shows that the court was aware that defendant was suffering from depression at the time of the offense and gave consideration to that information.

¶ 85 The record also shows, however, that the trial court was extremely disturbed by the facts and circumstances involved in defendant's murder of his three-year-old son. Officer Jackson testified at trial that he found Jaivon lying on the bedroom floor experiencing convulsions, murmuring, and gurgling with blood coming from his neck. Jaivon was nearly decapitated from a cut to the back of his neck and was bleeding profusely. The parties stipulated that the medical examiner described the cut to Jaivon's neck as a gaping wound that was 4 inches long by 1½ inches wide and 1 inch deep. The medical examiner also found that Jaivon suffered numerous stab and incised wounds to his back, chest, shoulders, left arm and right leg. In imposing the sentence, the trial court stated that defendant's actions were "absolutely inexplicable" and that it "had no idea how any father could do that to his son." The court then stated "I find the appropriate sentence in this case to be the rest of your natural life."

¶ 86 The record therefore shows that the trial court properly based defendant's sentence on its consideration of the seriousness of the offense, the factors in aggravation and mitigation, which included his nonviolent criminal history, the information contained in the PSI, and the evidence presented at the sentencing hearing. This court will not reweigh the sentencing factors or substitute our judgment for that of the trial court (*Alexander*, 239 Ill. 2d at 213), and based on the record before us, we cannot say that the sentence imposed by the court is excessive, manifestly disproportionate to the nature of the offense, or that it departs significantly from the intent and purpose of the law. *Fern*, 189 Ill. 2d at 56. Accordingly, we find no abuse of discretion by the trial court in sentencing defendant to a term of natural life imprisonment.

¶ 87 For these reasons, we vacate the aggravated domestic battery conviction and affirm defendant's convictions and sentences for first degree murder, attempted first degree murder, and aggravated criminal sexual assault in all other respects.

¶ 88 Affirmed as modified.