2019 IL App (1st) 160986-U
No. 1-16-0986

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

SECOND DIVISION
December 24, 2019

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court |
| | ) | of Cook County. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 12 CR 2706 |
| | ) | |
| ANDREW SALAMON, | ) | |
| | ) | The Honorable |
| Defendant-Appellant. | ) | Erica L. Reddick, |
| | ) | Judge Presiding. |

_____

JUSTICE PUCINSKI delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Lavin concurred in the judgment.

**ORDER**

¶ 1    *Held:*  Defendant's first degree murder, armed robbery, and burglary convictions affirmed where the circuit court properly denied his pretrial motion to suppress his statement.

¶ 2    Following a jury trial, defendant Andrew Salamon was convicted of first degree murder, armed robbery, and burglary.  On appeal, defendant seeks reversal of his convictions, arguing that the circuit court erred in denying his pretrial motion to suppress the inculpatory statement that he made to law enforcement officials after his arrest.  He argues that the statement was obtained in

contravention of his constitutional and statutory rights. For the reasons explained herein, we affirm the judgment of the circuit court.

¶ 3        BACKGROUND

¶ 4    In the early morning hours of October 4, 2009, 69-year-old Robert Gonzalez was physically attacked outside of the local bar that he owned. Approximately 15 hours after the assault, Gonzalez succumbed to his injuries and died. A police investigation into the crime ensued and defendant and another man named Raymond Jackson[1] became suspects relatively early on in the investigation. Defendant, however, was not arrested in connection with the crime until approximately two years later. At that time, he was charged with multiple offenses, including murder, armed robbery, and burglary.

¶ 5        Suppression Proceedings

¶ 6    Following his arrest, defendant filed a motion to suppress a statement he made to the officers investigating Gonzalez's death and to an Assistant State's Attorney (ASA). In the filing, defendant contended law enforcement officers impermissibly obtained the statement after he invoked his constitutionally protected right to speak with counsel. He further argued that the officers violated his Illinois statutory right to a phone call despite his repeated requests to make a call, which deprived him of his right to contact an attorney and rendered his statement involuntary. The circuit court presided over a hearing on defendant's motion.

¶ 7    At the hearing, defendant testified that the first encounter he had with police officers investigating Gonzalez's death occurred on November 15, 2010. On that date, he received a phone call from a detective who had "some routine questions" for him about an unspecified matter. In response to

_____

[1] The record contains no evidence as to whether Jackson was also charged in connection with Gonzalez's death. At the oral argument held in the matter, the Assistant State's Attorney who argued the case had no information about Jackson.

the call, defendant met with Detectives Thompson and Gillespie at the police station. At the station, the detectives began asking him questions about Raymond Jackson, a man defendant knew, in relation to a "serious matter," specifically a murder. At that point, defendant informed the detectives that he "would be more comfortable speaking with an attorney first before [he] talked to them." In response, the detectives told him that he was "free to go," and defendant left the station.

¶ 8   Defendant's next encounter with law enforcement occurred nearly one year later on November 9, 2011. On that date, he was pulled over by two police cars as he was driving home from work. After he stopped his vehicle, several officers displaying their handguns surrounded him and ordered him out of his car. Defendant was then handcuffed and placed in the back of one of the police cars. The two detectives with whom he had spoken a year earlier were also in the car. The detectives warned him that it was his "last chance to cooperate," but defendant responded that he "did not wish to cooperate" and reiterated that he "wanted to speak to a lawyer." The detectives ultimately escorted him to an interrogation room at the police station and advised him of his *Miranda* rights. Defendant again repeated that he wanted to "speak to a lawyer;" however, he was not permitted to use a telephone to call an attorney or members of his family. He spent the night alone in the interview room. He was only permitted to leave the room to use the bathroom. During those bathroom breaks, officers continually urged him to cooperate with their investigation.

¶ 9   Defendant testified that he made repeated requests for a phone call, stating: "I know I was screaming for it. I asked for it several times. I said I wanted a phone call. I know I was banging on the door, kicking the door saying I want a phone call." He relayed his desire for a phone call to multiple officers; however, none of the officers permitted him the use of a telephone. Sometime on November 10, 2011, after he invoked his right to an attorney and after his repeated requests for

a phone call were ignored, defendant provided a statement to the detectives. Shortly thereafter, he provided a videotaped statement to an ASA.

¶ 10    On cross-examination, defendant estimated that his first interview with detectives in 2010 lasted "maybe 15 minutes." On that occasion, he drove himself to the interview and was never handcuffed or given *Miranda* admonishments. The detectives simply spoke to him for a short time and inquired whether he would be willing to submit to a polygraph examination; however, when he responded that he would be more comfortable doing so with an attorney present, the detectives told him that he was free to leave and defendant left the station.

¶ 11    When asked to provide further details about his interaction with officers following his November 9, 2011, arrest, defendant recalled that detectives activated electronic recording equipment when they entered the interview room. He acknowledged that when he told the detectives that he did not wish to speak to them without an attorney present, they stopped asking him questions and left the interview room. Although he remained in the interview room overnight, he was provided with food and water and was escorted to the bathroom on at least three or four occasions. He was also given contact lens solution when he experienced problems with his eyes. Defendant confirmed that detectives did not question him about any crime after he requested an attorney; however, the officers who escorted him to and from the bathroom urged him to cooperate with their investigation. Defendant recalled that he started crying and pounding on the interview room's walls sometime on November 10, 2011. When an officer opened the door, defendant indicated that he wanted to speak to Detectives Thompson and Gillespie. Shortly thereafter, the detectives reentered the interview room. At that point, the detectives again admonished defendant of his *Miranda* rights, explaining that they needed to do so because he had initially declined to speak with them without an attorney present. After being readmonished, defendant admitted that he

provided the detectives with a statement. He provided another statement to an ASA who arrived sometime thereafter.

¶ 12     On redirect examination, defendant testified that when he began pounding on the interview room's wall, he did so because he wanted to call his mother so that she could find him an attorney. When Detectives Thompson and Gillespie reentered the interview room, however, they informed him that he would have to "wait" for a phone call. Ultimately, he was never provided with an opportunity to make a phone call.

¶ 13     Detective Timothy Thompson testified that he met defendant for the first time on November 15, 2010, when defendant drove himself to the police station to speak with them at their request. He confirmed that on that occasion, defendant was not under arrest, handcuffed, or given *Miranda* warnings. He recalled that he and his partner, Detective Gillespie, simply had a conversation with defendant and asked if he would be willing to take a polygraph. Defendant, however, declined and indicated that he wanted to have an attorney with him before doing so. In response to defendant's invocation of his right to counsel, the detectives informed defendant that he was free to leave and he did so.

¶ 14     Detective Thompson next encountered defendant on November 9, 2011, the date that defendant was arrested in connection with Gonzalez's murder. Following his arrest, defendant was transported to the Area North Police Station. Shortly after 6 p.m., defendant was placed in an interview room. Detective Thompson testified that he activated the room's electronic recording system and immediately advised defendant of his *Miranda* rights. After being advised of his rights, defendant indicated that he wanted to speak with an attorney. At that point, Detective Thompson and his partner ceased speaking to him and left the room. Detective Thompson testified that he did not ask defendant any questions or speak to him about the homicide and robbery at issue until

sometime around 5:15 p.m. the following day, after defendant reinitiated contact with them. He confirmed that defendant was provided with food, water, and contact lens solution during the time that he remained at the station. Defendant was also given bathroom breaks. Detective Thompson recalled that he personally escorted defendant to the bathroom at least once; however, he denied that he spoke to defendant about the case on that occasion.

¶ 15    Sometime after 5 p.m. on November 1, 2011, his colleague, Detective Moriarty, informed him that defendant was kicking the door of the interview room. When he and his partner entered the interview room, defendant stated that he was "ready to talk." Given that defendant had initially declined to speak with them, he was informed that he would need to be re-*Mirandized*. After Detective Thompson re-admonished defendant, he proceeded to speak with them about Gonzalez's murder.

¶ 16    Detective Thompson testified that the electronic recording instrument remained "continuously" activated from the time that defendant was initially brought into the interview room on November 9, 2011, to the time that defendant gave his statement the following day.[2] The equipment was also activated when defendant provided another statement to ASA Miki Miller. Detective Thompson acknowledged that defendant was not afforded an opportunity to make a phone call until after he spoke to ASA Miller. He explained, however, that pursuant to Area North's procedure, arrestees are not "normally" given phone access until after the booking process is completed. Defendant was not booked until he provided his statement to them and to ASA Miller.

¶ 17    On cross-examination, Detective Thompson testified that he "d[id not] specifically recall" whether defendant asked to make a phone call after he invoked his right to counsel following his 2011

_____

[2] The record on appeal only contains a video recording of the statement that defendant provided to ASA Miller. Video footage of the hours that defendant spent in custody confined to the interview room has not been provided to this court.

arrest, but admitted that defendant "could have" done so. He also acknowledged that defendant remained locked in the interview room for approximately 24 hours after he first requested to speak to an attorney. Given that defendant remained confined to the interview room, defendant had no means to contact an attorney during that time. Detective Thompson confirmed that defendant remained handcuffed and locked alone in the interview room until he reinitiated contact with the officers around 5 p.m. on November 10, 2011.

¶ 18    After hearing the aforementioned testimony, the court denied defendant's motion to suppress, explaining its ruling as follows:

"The Court after considering the evidence and the arguments finds that the statements were not taken in violation of the defendant's rights as to *Miranda* warnings. The Court does find that considering all of the evidence that has come forth that the defendant did reinitiate contact with the police. That the police did provide detailed *Miranda* warnings to the defendant at that time. The defendant indicated that he understood the warnings and that he waived them and did, in fact, agree to speak with the police.

That the police were slow in providing a phone call. Certainly the Court understands the argument of counsel with respect to his ability to access a phone call and attorney services during the time. But the Court does not find improper conduct on the part of the police or conduct violating *Miranda* warnings or any constitutional rights.

As such the motion to suppress statements is denied."

¶ 19    Thereafter, the cause proceeded to trial.

¶ 20    Trial

¶ 21    At trial, Sam Kelfino testified that he had known Gonzalez, the owner of O'Lanigan's bar, for 30 years and described him as a "good friend." In September 2009, Gonzalez had hired Kelfino, who

worked as a contractor, to remodel the exterior of the establishment. On September 11, 2009, Kelfino spent the day working on the remodel. At the end of his workday, Kelfino went home, showered, and then returned to the bar with his girlfriend later that evening. Sometime that evening when Kelfino stepped outside of the bar to smoke a cigarette, he was approached by Raymond Jackson. Kelfino explained that he knew Jackson "briefly" as he had encountered him once or twice before and described him as the "neighborhood bully." Kelfino was standing by a pole located near the entrance of the bar when Jackson approached him and ordered him to move. When Kelfino did not immediately respond to his order, and Jackson stated that they could "do this the hard way or the easy way." He then "swung and hit" Kelfino in the mouth with his fist. Kelfino, who was a former professional boxer, responded by punching Jackson in the right side of his face. Jackson was knocked out by Kelfino's punch and fell the ground. As Jackson lay unconscious on the ground, the police were called. When Jackson regained consciousness, he wanted to enter the bar, but Gonzalez refused him entry. Kelfino recalled that Jackson became "upset" at Gonzalez because Gonzalez "was kind of laughing at him because he got knocked out" and did not allow him into the bar. Jackson was ultimately taken to the hospital.

¶ 22    Kelfino testified that Jackson called him approximately one week after their altercation and asked Kelfino "to go in cahoots with him" and falsely say that their altercation had occurred inside of the bar so that Jackson could file a lawsuit and recover money from the bar. Kelfino, however, declined Jackson's request.

¶ 23    Iulia Valozna, a bartender at O'Lanagan's, started her shift on October 3, 2009, at 7 p.m. and worked until 3 a.m. on October, 4, 2009, which is the time the bar closed. That night, the bar was "slow" and "quiet." Once the last customer left, Valozna and Gonzalez counted the money and Gonzalez paid her what she was owed. Valozna estimated that the bar only brought in "maybe"

$400-450 that evening. The two then prepared the bar for business the next day, a process that lasted approximately 30 minutes. Afterwards, Valozna exited the bar through the rear door. Gonzalez followed her to the door and watched out the window to ensure that she made it safely to her car. Valozna testified that Gonzalez was responsible for setting the alarm after she left the building. She never saw Gonzalez alive after that night.

¶ 24 Jose Santos, an acquaintance of Jackson's for 10 years, testified that one evening toward the end of September 2009, he was with Jackson and they were looking for Sam Kelfino. The two men went to a bar called "June's," which was located around the corner from O'Lanagan's, but they were unable to find Kelfino that evening. Santos recalled that as they were searching for Kelfino, Jackson was concealing a "lead pipe" in his shirt sleeve. The pipe was about a foot and a half long and had tape wrapped around the handle.

¶ 25 Santos next saw Jackson on the evening of October 3, 2009. On that occasion, Jackson and defendant drove over to Santos's house. Santos had not met defendant prior to that evening and Jackson introduced him as his friend, Andrew. Santos entered the backseat of the vehicle and the three men had a conversation "about doing a burglary" at O'Lanagan's. Based on their estimations of the bar's proceeds, the men expected the robbery to yield $5,000. During the course of the conversation, the men agreed that Santos would act as the "watch out" while defendant broke into the bar's gambling machines and Jackson recovered a box of money from the lower level of the bar. According to Santos, defendant was planning on using the crowbar that was in his possession to break into the bar's gambling machines. Because this discussion occurred before midnight and the bar did not close until 2 or 3 a.m., Santos instructed Jackson and defendant to return and pick him up later. Although Santos was initially planning on being involved in the burglary, he testified

that he started feeling that "something was going to go wrong" and that he ultimately decided not to go to O'Lanagan's with defendant and Jackson later that night.

¶ 26    After the crime, Santos was asked to view a photo array, which contained six pictures. Defendant's picture was included in that array and Santos identified him as the man he had seen with Jackson the night of the robbery.

¶ 27    On cross-examination, Santos testified that he knew Jackson from the neighborhood and that they had been members of rival gangs. He considered Jackson to be dangerous and testified that he was often high on drugs, particularly crack cocaine. On the night that he went with Jackson to look for Kelfino, Santos called one of his friends to let him know he was with Jackson in case he disappeared. Santos admitted that he had five prior convictions for retail theft.

¶ 28    Apolonio Retama, defendant's friend for the past 15 years, testified that he received a phone call from defendant sometime in the Fall of 2010 and defendant relayed that he had "d[one] something bad." In response, Retama invited defendant over to his house to talk in person, and defendant did so. During their subsequent conversation, defendant, who was visibly upset, expressed his concern that he was going to "go[] down for murder." Defendant explained that he "went with [Jackson][3] to a bar" to "help [Jackson] rob it." According to defendant, Jackson wanted to rob the bar because he had been involved in a fight at the bar and "he wanted to get even with the owner" who had thrown him out. After hearing Jackson's story, defendant "agreed to go with him to rob the place." Defendant told Retama that he and Jackson arrived at the bar "sometime after closing" to "ransack[] the cash register and the bar." While they were there, they "ran into the owner." When the bar owner grabbed defendant's shoulder, defendant punched the owner's head with a closed

_____

[3] In his confession to Retama, defendant referred to Jackson as "Ray."

fist and Jackson "hit the guy with a pipe." According to defendant, Jackson continued to "hit the guy [with the pipe] until he died."

¶ 29 After hearing defendant's account of what had occurred, Retama urged him to turn himself in to police. Defendant agreed to talk to law enforcement officials and Retama accompanied him to the police station. Retama sat in the waiting room while defendant spoke to detectives. He estimated that defendant was "gone with the officers" for approximately four hours. When defendant returned, he was "scared" and "shaking." The two then left the police station together. Retama testified that no one else was present during the conversation that he had with defendant in the Fall of 2010.

¶ 30 On cross-examination, Retama acknowledged that defendant never specifically told him where the murder occurred or identified the bar in question. Defendant also never said anything about possessing a crowbar himself. Moreover, defendant "didn't tell" Retama whether he and Jackson had actually entered the bar.

¶ 31 Thomas Schultz testified that he works as a project manager at Keith Technologies, the company that installed the alarm system at O'Lanagan's. The alarm system had panels installed at the front and back doors of the establishment. A motion detector was installed at the front door as well, which was designed to detect movement within the bar. The system could be armed or disarmed at either point of egress and data reflecting the arming and disarming of the system was stored within the alarm panels. A person making entry at either location would have 30 seconds to input the proper code before the alarm would be triggered. In the event that the alarm was triggered, a signal would be sent to the monitoring company, and an employee from that company would then contact the client.

¶ 32    Schultz testified that he reviewed the data stored in O'Lanagan's alarm panels as well as the reports maintained by the monitoring company reflecting the system's use on October 4, 2009. The data reflects that the system was armed at 4:23 a.m. on October 4, 2009. The rear door was subsequently breached at 4:26 a.m., and the alarm was triggered. The rear door was then closed and opened again one minute later. After the alarm was triggered, the monitoring company made phone calls to two different numbers, but was unable to obtain a response. As a result, the monitoring company notified the Chicago police. The establishment's motion detector was triggered by movement within the building at 4:43 a.m., which may have signaled the arrival of the responding officers. Schultz testified that he inspected O'Langan's alarm system the next morning and found that it was in proper working order.

¶ 33    Chicago Police Officer Emmert Gouthier testified that he was dispatched to investigate the sounding of an alarm at O'Lanagan's, a bar located at 2335 West Montrose at approximately 4:47 a.m. on October 4, 2009. At the time of the dispatch, he was on routine patrol in the area and he estimated that he arrived at the bar within two or three minutes after receiving the dispatch. Shortly thereafter, he was joined by Officer Lutzow, who had also been assigned to investigate the alarm. The two officers first approached the front door and found that it was "locked and secure." There were no broken windows or other signs of forced entry visible from the front of the bar. The officers then walked to the rear of the building and Officer Gouthier discovered that the rear door was unlocked. The officers entered the bar and found it empty. When the officers exited the building, Officer Gouthier heard a "growling noise." He shined his flashlight on the ground to locate the source of the noise and noticed "traces of blood" on the sidewalk. He followed the trail of blood and discovered Gonzalez lying on the ground between two vehicles that were parked in the bar's rear parking lot. Officer Gouthier observed a "lot of blood" pooled around Gonzalez's

head and immediately used his radio to call for an ambulance. As they waited for the ambulance to arrive, Officer Lutzow spoke to the Gonzalez, but he was unresponsive. Officer Gouthier walked around the scene and observed blood, a cell phone, and a pair of glasses on the grass parkway.

¶ 34    On cross-examination, Officer Gouthier testified that there were no pry marks by the rear door. Although the officers found that rear door was unlocked, it was shut when they arrived at the scene. In his opinion, the bar did not appear to have been ransacked.

¶ 35    Carol Thornton, a paramedic with the Chicago Fire Department, was dispatched to O'Lanagan's bar at approximately 4:46 a.m. on October 4, 2009. When she encountered Gonzalez at that location, Thornton conducted a preliminary assessment of his physical condition. At that time, he was breathing on his own and was making "grumbling" and "groaning" noises; however, he was unable to respond verbally to any commands. Thornton observed two lacerations on his head that were approximately four to five inches in length. In an effort to stop the bleeding, Gonzalez packed Gonzalez's wounds with gauze. She also provided Gonzalez with supplemental oxygen and used a C-collar and a long board to immobilize him before transporting him to Illinois Masonic Hospital. When he arrived at the hospital, Gonzalez was still alive and breathing on his own; however, he remained non-verbal and unresponsive.

¶ 36    Dr. Stephen Cina, chief medical examiner at the Cook County Medical Examiner's Office and a qualified expert in the area of forensic pathology, reviewed Gonzalez's autopsy report that was completed by a former member of his office. The report contained findings that were made following external and internal examinations of Gonzalez's body. The external examination revealed that Gonzalez had "three large lacerations on the back of his head," which were caused by "blunt force" trauma. In addition, Gonzalez had "some skull fractures which resulted in

bleeding into the tissues around his eye," as well as an abrasion on his right wrist, and several bruises on his right forearm. The internal examination provided additional evidence of skull fractures as well as evidence of bleeding and bruising of the brain. Given the nature of Gonzalez's injuries, Dr. Cina believed that he had been struck by a weapon that was relatively narrow, but heavy enough to be wielded with force, such as a pipe, crow bar, or baseball bat. Based on his examination of the autopsy report, Dr. Cina opined that Gonzalez died as a result of "cranial cerebral blunt force injuries" that were caused by "multiple impacts to the head." He classified the manner of Gonzalez's death as a homicide.

¶ 37     Mikki Miller, an ASA, with the Cook County State's Attorney's Office, testified that she conducted an interview with defendant on November 10, 2011, at approximately 8 p.m. at the Area North police station. Detective Gillespie was also present for the interview, which lasted approximately 30 minutes and was recorded on video. Based on her review of the recording, Miller testified that it fairly and accurately depicted her interaction with defendant. The recording was then published to the jury.

¶ 38     In the recording, defendant stated that he had met Jackson "through friends," but that they had only spoken 5 or 6 times prior to October 3, 2009. That evening, defendant went out for drinks with Jackson. When he picked Jackson up, defendant observed him wrapping a metal pipe with black tape. Jackson told defendant that he had been to a bar recently where he had been in an altercation and that the owner of the bar had laughed at him, which "really pissed [Jackson] off." Jackson explained that he was going to take the pipe with him "just in case" he needed it "for protection." Defendant and Jackson then went to a local bar and had drinks. While they were drinking, Jackson proposed robbing the bar owner who had laughed at him. Jackson explained that there were several poker machines at O'Lanagan's and estimated that they could walk away

with $50,000 if they emptied the machines after the bar closed. Defendant did not have any money so he agreed to take part in the robbery. Specifically, he agreed to act as the "lookout" while Jackson would enter the bar and would take the money.

¶ 39    The two men went to three or four other bars that evening and consumed one or two drinks at each establishment. They agreed that O'Lanagan's would be the last stop and that defendant would enter the bar, have a drink, and take a look around to see if there were any cameras inside. Defendant did so. When he joined Jackson in the car, Jackson stated that he "kn[e]w somebody that c[ould] help [them] out." Following Jackson's directions, defendant drove to Santos's[4] house. Defendant had not met Santos before that evening. When they reached Santos's house, he joined the two men in defendant's car and Jackson told him about their plans for the robbery. Santos, however, ultimately declined to take part in the crime because he was on parole.

¶ 40    At that point, defendant and Jackson left Santos's house and drove around for a while as they waited for O'Lanagan's to close. As defendant was driving, Jackson leaned out of the car window and smashed the window of a parked car with his metal pipe. Jackson explained that he wanted to "test" out the pipe, but defendant thought he was crazy. Defendant then drove back to O'Lanagan's and the two men watched people leave the bar. After a period of time, Jackson approached the rear door of the bar and found it locked. Jackson saw Gonzalez inside of the bar and he told defendant that he would get the keys to the bar from Gonzalez. When defendant inquired how Jackson was going to do that, Jackson responded that he was "a persuader." Shortly thereafter, Gonzalez exited the bar via the rear door. When he did, he noticed defendant, who was standing there with his hood pulled over his head. Gonzalez began walking away from him. At that point, Jackson then "swung" at Gonzalez, who stumbled and fell to the ground. Jackson continued hitting

---

[4] In the recording, defendant refers to Santos by his nickname, "Mentos."

Gonzalez with the pipe and defendant could tell from the manner in which Jackson attacked Gonzalez that there was a "personal" issue between the men. Defendant yelled at Jackson to stop hitting Gonzalez because the pipe was "not part of the plan."

¶ 41 Once Jackson stopped striking Gonzalez with the pipe, he dragged Gonzalez's body in between two cars that were in the rear parking lot. He then gave defendant the keys that he had recovered from Gonzalez. Defendant used the keys to open the rear door, but he immediately heard beeping noises, which he believed was an alarm. As a result, he never actually entered the bar. Instead, he "took off" back to his car. When he reached his vehicle, defendant observed Jackson using baby wipes to clean the pipe. At that point, defendant stated that he knew that Jackson had "planned" to attack Gonzalez. As the two men drove away from the scene, Jackson put his hands down defendant's pocket looking from the money, but defendant explained that he had never entered the bar because of the alarm. Jackson then instructed defendant to keep quiet about what had happened. Defendant recalled that he "flipped" Gonzalez's keys out of his car window as he was driving and that Jackson disposed of the pipe in a garbage can near his house. When they arrived at Jackson's house, defendant noticed that there was blood on the passenger seat. Defendant subsequently used soap and water to clean his car.

¶ 42 Two days later, Jackson called defendant to make sure that he was "keeping his mouth shut." Defendant assured Jackson that he was and Jackson responded, "good." According to defendant, that was the last occasion that he talked to Jackson. Approximately one year later, defendant learned that the police wanted to talk to him. He told his friend Apolonio Retama[5] about the events that transpired at the bar and Retama accompanied him to the police station. Defendant did not recall if he told Retama that he personally touched Gonzalez, but stated that he "never touched the

[5] In the recording, defendant refers to Retama by his nickname, "Polo."

guy at all." If he had told Retama that he had touched Gonzalez, defendant explained that he likely did so to avoid looking "like a bitch."

¶ 43    Detective John Gillespie testified that he was dispatched to O'Lanagan's bar on October 4, 2009. After he went to the scene to "look around," he returned to the Area North police station. Later that day, he had a conversation with Sam Kelfino, who relayed his suspicions that Jackson had attacked Gonzalez. Kelfino described about the altercation he had with Jackson several weeks earlier and explained that Jackson "was looking for retaliation and reimbursement for his hospital bills." Detective Gillespie continued his investigation and interviewed Jose Santos on November 6, 2009. During the interview, Santos informed him that Jackson and another man had approached him and discussed burglarizing O'Lanigan's bar. Santos did not know the name of the other man, but described him as a "white male in his early 20's." Based on the information he had been provided, Detective Gillespie subpoenaed Jackson's cell phone records to ascertain "who he might have been talking to before the murder occurred." Jackson's records established that defendant was one of the individuals that Jackson called around the time of the murder. After obtaining defendant's name, Detective Gillespie searched for defendant in the police database. His search revealed that defendant matched the description of the unknown individual provided by Santos. As a result, Detective Gillespie included defendant's picture in a six-person photo array that he subsequently showed to Santos. After viewing the photo array, Santos identified defendant as the man who had been with Jackson when they discussed the burglary.

¶ 44    Thereafter, on November 15, 2010, Detective Gillespie and his partner, Detective Thompson, interviewed defendant at the Grand and Central station. Defendant was not arrested at that time and Detective Gillespie continued his investigation. Defendant was eventually arrested for his involvement in the crime on November 9, 2011, when he was apprehended by the Fugitive Unit.

Following his arrest, defendant was transported to Area North and was taken to an interview room, which was equipped with a table, chair, a bench, and a ring affixed to the wall. Detective Gillespie testified that defendant was immediately handcuffed to the wall to ensure officer safety. Defendant remained in the interview room for more than 24 hours. During that time, he was kept handcuffed to the wall except for the occasions when he was taken to the bathroom or when he was given cigarettes, food, and something to drink.

¶ 45    After presenting the aforementioned testimony, the State presented a series of stipulations. Pursuant to the first stipulation, the parties agreed that if called upon to testify, Ruben Ramos, a forensic scientist with the Illinois State Police Forensic Scientist Command, would testify that he received various evidence collected in connection with the crime as well as DNA standards taken from both defendant and Jackson. None of the evidence collected at the crime scene that was suitable for DNA analysis and comparison was found to match the DNA profiles of either defendant or Jackson. The parties further stipulated to the testimony of Sheila Dougherty, a forensic scientist in the fingerprint section of the Illinois State Police Forensic Sciences Command and an expert in the field of fingerprint analysis. If called as a witness, Dougherty would testify that she received several items collected in connection with the crime, but was unable to find any fingerprints suitable for analysis and comparison on any of those items. Finally, the parties stipulated that in January 2010, Detective Gillespie subpoenaed Jackson's cell phone records. Those records revealed that Jackson's cell phone pinged a cell phone tower at 4740 North Western Avenue on October 4, 2009, at 4:04 a.m. That tower is located approximately 4 blocks away from O'Lanagan's bar. The records further revealed that Jackson's cell phone pinged a different cell phone tower located at 2802 North Milwaukee Avenue on October 4, 2009, at 4:44 a.m.

¶ 46 After presenting the aforementioned evidence, the State rested its case-in-chief. The defense rested without calling any witnesses and the parties delivered closing arguments. After receiving the relevant instructions, the jury commenced deliberations and returned with a verdict finding defendant guilty of burglary, armed robbery, and first degree murder. Defendant's posttrial motion was denied and the cause subsequently proceeded to a sentencing hearing where the State presented evidence in aggravation and the defense presented evidence in mitigation. After considering the evidence presented, the court sentenced defendant to 25 years' imprisonment for first degree murder, 8 years' imprisonment for armed robbery, to be served consecutively to the first degree murder sentence, and 4 years' imprisonment for burglary, the sentence to be served concurrently with his armed robbery sentence. Defendant's postsentencing motion was denied and this appeal followed.

¶ 47 ANALYSIS

¶ 48 On appeal, defendant argues that the circuit court erred in denying his pretrial motion to suppress his inculpatory statement. Specifically, he argues that the statement was improperly obtained in contravention of his constitutional and statutory rights because it was made after he invoked his right to an attorney and after officers precluded him from making a phone call while he was in custody.

¶ 49 The State responds that the circuit court properly denied defendant's motion to suppress where defendant, after initially invoking his right to counsel, voluntarily reinitiated contact with police, waived his *Miranda* rights, and admitted to his role in Gonzalez's murder.

¶ 50 As a general rule, a circuit court's ruling on a motion to suppress is subject to a bifurcated two-prong standard of review. *Ornelas v. United States*, 517 U.S. 690, 699 (1996); *People v. Johnson*, 237 Ill. 2d 81, 88 (2010). Pursuant to this standard, a reviewing court will afford great deference

to the circuit court's factual findings and will disregard those findings only where they are against the manifest weight of the evidence. *Johnson*, 237 Ill. 2d at 88; *People v. Lopez*, 2013 IL App (1st) 111819, ¶ 17. The circuit court's ultimate legal finding as to whether suppression is warranted, however, is subject to *de novo* review. *People v. Colyar*, 2013 IL 111835, ¶ 31; *People v. Bartelt*, 241 Ill. 2d 217, 234 (2011). Accordingly, "[a] court of review 'remains free to engage in its own assessment of the facts in relation to the issues presented and may draw its own conclusions when deciding what relief should be granted.' " *People v. Gherna*, 203 Ill. 2d 165, 175-76 (2003) (quoting *People v. Crane*, 195 Ill. 2d 42, 51 (2001)). When conducting this analysis, a reviewing court may consider the evidence presented at trial in addition to the evidence presented during the earlier suppression hearing. *People v. Almond*, 2015 IL 113817, ¶ 55.

¶ 51 With respect to the admissibility of a suspect's statement, federal and state constitutional mandates prohibit the admission of any statement that was made involuntarily (*People v. Nicholas*, 218 Ill. 2d 104, 118 (2005); *People v. Jones*, 2014 IL App (1st) 120927, ¶ 48). The admission of a defendant's involuntary statement in a criminal trial amounts to a denial of due process of law. See *Jackson v. Denno*, 378 U.S. 368, 376 (1964)) (explaining that "a defendant in a criminal case is deprived of due process of law if his conviction is founded, in whole or in part, upon an involuntary confession without regard for the truth or falsity of the confession [citation], and even though there is ample evidence aside from the confession to support the conviction").

¶ 52 Throughout the years, courts have recognized that the conduct of law officials may affect the voluntariness of a suspect's statement. See *J.D.B. v. North Carolina*, 564 U.S. 261, 268 (2011) (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (observing that "[a]ny police interview of an individual suspected of a crime has 'coercive aspects to it' " and creates a risk that a statement obtained from a suspect is not the product of the suspect's free will). Custodial police

interrogations, in particular, which involve isolation and other "inherently compelling pressures" (*Miranda v. Arizona*, 384 U.S. 436, 467 (1981)) " 'heighte[n] the risk' " that any statements procured during such an interrogation are not the product of the suspect's free choice (*J.D.B.*, 564 U.S. at 268-69 (quoting *Dickerson v. United States*, 530 U.S. 428, 435 (2000)). Recognizing this risk, the United States Supreme Court "adopted a set of prophylactic measures designed to safeguard the constitutional guarantee against self-incrimination" and mandated that a suspect who is the intended subject of a custodial interrogation or its functional equivalent " 'must be warned that he has the right to remain silent, that any statement he does make may be used as evidence against him, and that he has the right to the presence of an attorney, either retained or appointed.' " *Id.* at 269 (quoting *Miranda*, 384 U.S. at 444).

¶ 53    If, after being informed of the right to have counsel present, a suspect invokes his right to an attorney, the custodial interrogation must cease until the suspect is provided with the opportunity to confer with an attorney and to have counsel present during any subsequent questioning. *Miranda*, 384 U.S. at 474; *People v. Olivera*, 164 Ill. 2d 382, 389 (1995). This rule is " 'designed to prevent police from badgering a defendant into waiving his previously asserted *Miranda* rights.' " *Davis v. U.S.*, 512 U.S. 452 (1994) (quoting *Michigan v. Harvey*, 494 U.S. 344, 350 (1990)). Accordingly, once a suspect invokes his right to counsel, law enforcement personnel are precluded from questioning him or from engaging in any conduct designed to elicit an incriminating response from the suspect until counsel has been made available unless the accused initiates further communications, exchanges, or conversations with police. *Edwards v. Arizona*, 451 U.S. 477, 484 (1981); *Olivera*, 164 Ill. 2d at 389-90.

¶ 54    In this case, there is no dispute that following defendant's arrest for Gonzalez's murder, he was taken to an interview room, informed of his *Miranda* rights, and that he invoked his right to

counsel. There is likewise no dispute that in response to defendant's request for counsel, detectives properly ceased their efforts to converse with defendant about the crime. See *Miranda*, 384 U.S. at 474; *Olivera*, 164 Ill. 2d at 389. Defendant was then left him alone in the interview room, where he remained handcuffed for approximately 24 hours.[6] During that time, defendant was permitted several bathroom breaks and was provided with food, drink, and contact lens solution. He was not, however, afforded access to a telephone or provided with any other means to contact an attorney. It was only after defendant remained isolated in an interview room for approximately 24 hours that he reinitiated contact with police and expressed his willingness to make a statement to the detectives. After being re-informed of his *Miranda* rights and waiving his right to counsel, defendant made a statement to the authorities.

¶ 55    In his appellate brief, defendant raises no argument concerning the voluntariness of his decision to reinitiate contact with police and waive his right to an attorney after initially invoking his right to counsel; rather, he only contests the voluntariness of the statement that he provided after he reinitiated contact with police and after he waived his *Miranda* rights. At oral argument, however, his appellate attorney suggested for the first time that defendant's decision to reinitiate contact with Detectives Thompson and Gillespie and waive his right to counsel was likewise involuntary. We note that the voluntariness of an admission and the knowing, voluntary, and intelligent waiver of the right to counsel after a suspect reinitiates contact with police are "discrete inquiries." *Edwards*, 451 U.S. at 484. Having failed to raise the issue of the voluntariness of his decision to reinitiate contact with police and waive his right to counsel in his appellate brief, that issue is not

---

[6] In his appellate brief, defendant argues that his pre-statement detention lasted 25 hours. Based on the record, it appears defendant was placed in an interview room sometime after 6 p.m. on November 9, 2011, and that he reinitiated contact with police sometime after 5 p.m. on November 10, 2011, and provided a statement to Detectives Thompson and Gillespie. He provided a second statement to ASA Miller at approximately 8 p m. It thus appears from the record that defendant was detained slightly less than 24 hours before he provided his first statement. Since the timing of the beginning and end of defendant's pre-statement detention is not specific, we will refer to the length of defendant's pre-statement detention as one that lasted "approximately 24 hours."

properly before this court. See Ill. S. Ct. R. 341(h)(7) (eff. May 25, 2018) ("Points not argued are forfeited and shall not be raised in the reply brief, in *oral argument*, or on petition for rehearing) (Emphasis added.); see also *Elementary School District 149 v. Schiller*, 221 Ill. 2d 130, 143 n.2 (2006) (finding that an argument raised by the plaintiffs for the first time at oral argument was forfeited). Accordingly, the only issue before this court is whether the statement that defendant made after he reinitiated contact with law enforcement personnel and waived his right to counsel was made voluntarily.

¶ 56    " 'The test for voluntariness of a statement is whether the individual made the statement freely, voluntarily, and without compulsion or inducement of any kind, or whether the individual's will was overcome at the time of the confession.' " *People v. Hughes*, 2015 IL 117242, ¶ 31 (quoting *People v. Morgan*, 197 Ill. 2d 404, 437 (2001)). A confession is deemed voluntary "if is the product of free will, rather than the inherently coercive atmosphere of the police station." *Nicholas*, 218 Ill. 2d at 118; see also *People v. Sandifer*, 2017 IL App (1st) 142740, ¶ 64 (recognizing that when a defendant's will is overborne, his "confession cannot be considered the product of a rational intellect and free will"). To determine the voluntariness of a statement, courts employ a totality of the circumstances analysis to evaluate the circumstances surrounding the statement including: the presence or absence of *Miranda* warnings; the defendant's age, intelligence, education and experience at the time of his detention and interrogation; the duration of the interrogation; the presence or absence of any physical or mental abuse during the detention and interrogation; and the legality of the detention. *Nicholas*, 218 Ill. 2d at 118; *People v. Jones*, 2014 IL App (1st) 120927, & 48. Under a totality of the circumstances analysis, no single factor is controlling. *In re G.O.* 191 Ill. 2d 37, 54 (2000); *Jones*, 2014 IL App (1st) 120927, ¶ 48. When reviewing a circuit court's ruling as to the voluntariness of a defendant's confession, the court's

factual findings will be upheld unless they are against the manifest weight of the evidence. *People v. Braggs*, 209 Ill. 2d 492, 505 (2003). Factual findings are against the manifest weight of the evidence " 'only when an opposite conclusion is apparent or when the findings appear to be unreasonable, arbitrary, or not based on the evidence.' " *Jones*, 2014 IL App (1st) 120927, ¶ 50 (quoting *Eychaner v. Gross*, 202 Ill. 2d 228, 252 (2002)). The circuit court's ultimate legal finding as to whether suppression is warranted, however, is subject to *de novo* review. *Braggs*, 209 Ill. 2d at 505; *People v. Kronenberger*, 2014 IL App (1st) 110231, ¶ 28.

¶ 57 At the time of his arrest, defendant was a 25-year-old high-school graduate who was gainfully employed as a maintenance supervisor at a property maintenance company. He had one prior conviction for possession of cannabis, for which he received a period of supervision, but he had never been arrested for, or convicted of, a serious or violent criminal offense or been the subject of a lengthy police interrogation.[7] Defendant does not dispute that his arrest was supported by probable cause[8] or that he was properly and adequately informed of his *Miranda* rights. Instead, he highlights the duration of his detention and contends that his lengthy detention, during which his repeated requests for a phone call to contact an attorney were denied, "rendered the protections of *Miranda* meaningless" and "had a coercive effect on him that rendered his statement involuntary." Defendant further argues that the statement was also obtained in violation of section 103-3 of the Illinois Code of Criminal Procedure of 1963 (Code or Code of Criminal Procedure),

---

[7] We note that Apolonio Retama testified that he accompanied defendant to his first meeting with detectives investigating Gonzalez's murder and estimated that the meeting lasted 4 hours. Defendant and Detective Thompson, however, both agreed that the first interview was very brief and concluded when defendant declined to submit to a polygraph test without an attorney present.

[8] Defendant did file a motion to quash his arrest in the circuit court in which he contested the propriety of his arrest. Following a hearing, the circuit court denied the motion, finding that defendant's arrest was supported by probable cause because police had "information sufficient" to believe that a crime had been committed and that he was a "willing participant in the commission of that crime." Defendant does not contest the court's ruling or raise any arguments concerning probable cause on appeal.

which codifies the right of arrestees to communicate with their attorneys and family members "by making a reasonable number of telephone calls." 725 ILCS 5/103-3(a) (West 2008).

¶ 58    In support, defendant cites to the United States Supreme Court's decision in *Haynes v. State of Washington*, 373 U.S. 503 (1963) and this court's decision in *People v. Sanchez*, 2018 IL App (1st) 143899.    In *Haynes*, the court found that a statement made by a defendant following a prolonged period of "incommunicado detention" was involuntary.  In that case, the defendant was held for 16 hours following his arrest for robbery before he signed a written statement detailing his involvement in the crime.  Over those 16 hours, the defendant's repeated requests that he be allowed to call his wife and an attorney were denied and he was told that his access to a telephone was contingent upon his cooperation with law enforcement personnel.  Although there was no evidence that the defendant was physically abused in any way or deprived of food, water, or rest, the court found that the statement that the defendant ultimately signed after being held in custody for 16 hours was involuntary because it "was obtained in an atmosphere of substantial coercion and inducement created by statements and actions of state authorities." *Id*. at 513.  The court emphasized that the defendant was kept "alone in the hands of police, with no one to advise or aid him, and he had 'no reason not to believe that the police had ample power to carry out their threats,' to continue, for a much longer period if need be, the incommunicado detention—as in fact was actually done." *Id*. at 514 (quoting *Lynumn v. Illinois*, 372 U.S. 528, 534 (1963)).  Also significant was the fact that there was no "indication in the record that prior to signing the written confession, or even thereafter, [defendant] was advised by the authorities of his right to remain silent, warned that his answers might be used against him, or told of his rights respecting consultation with an attorney."[9] *Id*. at 510-11.  Ultimately, in finding the statement involuntary, the court observed that

[9] *Haynes* was decided before the United States Supreme Court issued its ruling in *Miranda*, which mandated that suspects in custody be informed of their rights.

the record reflected that the defendant "at first resisted making a written statement and gave in only after consistent denials of his requests to call his wife, and the conditioning of such outside contact upon his accession to police demands." *Id*. The court reasoned that "[c]onfronted with the express threat of continued incommunicado detention and induced by the promise of communication with and access to family [defendant] understandably chose to make and sign the damning written statement." *Id*. The court concluded that "given the unfair and inherently coercive context in which made, that choice cannot be said to be the voluntary product of a free and unconstrained will, as required by the Fourteenth Amendment." *Id*.

¶ 59    In *Sanchez*, 2018 IL App (1st) 143899, this court relied on *Haynes* to find a statement made by an arrestee after spending 12 hours in custody, during which time he was not permitted a telephone call, to be likewise involuntary. In that case, the 18-year old defendant was arrested for murder absent probable cause after police encountered him near the scene of the crime approximately 30 minutes after a shooting. *Id*. ¶ 6. He was transported to the police station and placed in an interrogation room, where he remained for 12 hours until he confessed. ¶¶ 8, 73. During that time, the defendant asked several times to call his mother, but was not permitted access to a telephone until he cooperated with the authorities. ¶¶ 22-24. In finding that the defendant's confession was involuntary, we noted: "[Defendant was 18 years old, with no criminal background, at the time of the interrogation. Police arrested him without probable cause and held him for 12 hours before he confessed. Most notably, the detectives told [defendant] he could not call his mother until he told them the truth about the shooting, and they told him they already knew he shot [the victim]." *Id*. ¶ 73. Based on those facts, we found the case indistinguishable from *Haynes*. *Id*. ¶¶ 74-75. We further found that the officer's actions in refusing to permit the defendant to call his mother constituted a violation of section 103-3(a) of the Code. ¶ 75.

¶ 60     Here, as in *Haynes* and *Sanchez*, defendant was subjected to a prolonged detention during which he was denied access to a telephone. Indeed, his detention, which lasted approximately 24 hours, exceeded the 16-hour detention at issue in *Haynes* and the 12-hour detention at issue in *Sanchez*. Although the length of a defendant's pre-detention statement and the denial of a defendant's request for a phone call are relevant factors when considering the totality of the circumstances of a defendant's statement, neither a lengthy detention nor the denial of telephone access mandates a finding that the statement was given involuntarily. See, *e.g.*, *People v. Nicholls*, 42 Ill. 2d 91, 101 (1969) (finding that the defendant's statement was voluntary where it was made after he had been detained for 34 hours because the circumstances of a defendant's detention was simply one factor "to be considered in determining if [the]confession was voluntary"); *People v. Williams*, 2017 IL App (1st) 142733, ¶ 30 (finding that the circuit court did not err in denying the defendant's motion to suppress his statement where "[t]he totality of the circumstances demonstrate[d] that [his] unsuppressed statements were voluntarily given, despite the denial of his request to make a phone call"). Indeed, when considering the totality of the circumstances, we find that there are important facts in this case that distinguish it from *Haynes* and *Sanchez*. Notably, defendant, unlike the defendant in *Haynes*, was informed of his rights on more than one occasion while he was in police custody. Moreover, defendant evidenced an understanding of his rights by first invoking his right to counsel and then by waiving his rights after reinitiating contact with police. In addition, unlike the defendants in *Haynes* and *Sanchez*, defendant's use of a telephone in this case was never conditioned upon his cooperation with law enforcement. Indeed, at the suppression hearing, defendant testified that he was simply told he had to "wait" for a phone call. Although it is true that defendant was not ultimately provided with access to a telephone during his pre-statement detention, Detective Thompson explained it was Area North's general practice not to provide

arrestees with telephone access until after the booking process was completed. Defendant was not booked until after he provided statements to detectives and ASA Miller. We note that there is no evidence in the record as to the typical length of time pursuant to which Area North arrestees are booked; however, defendant does not argue that his booking was purposely delayed in order to prevent him from making a phone call. Defendant, however, citing section 103-3 of the Code, does argue that the officers' failure to provide him with a phone call during his lengthy detention violated his statutory right to communicate with an attorney or family member.

¶ 61 As explained above, section 103-3 of the Code of Criminal Procedure codifies the right of arrestees to communicate with an attorney and a family member and provides as follows:

> "Persons who are arrested shall have the right to communicate with an attorney of their choice and a member of their family by making a reasonable number of telephone calls or in any other reasonable manner. Such communication shall be permitted within a *reasonable time* after arrival at the first place of custody." (Emphasis added.) 725 ILCS 5/103-3(a) (West 2008).[10]

The underlying purpose of the statute is to "permit a person held in custody to notify his family of his whereabouts and to notify them of the nature of the offense with which he is charged so that arrangements may be made for bail, representation by counsel and other procedural safeguards that the defendant cannot accomplish for himself while in custody." *People v. Prim*, 53 Ill. 2d 62,

---

[10] In a recently entered consent decree between the City of Chicago and the State of Illinois, which was approved by the United States District Court for the Northern District of Illinois, Eastern Division, on January 31, 2019, the Chicago Police Department (CPD) is now required to take additional steps to advise suspects of their right to an attorney and to provide them with access to a telephone. See 17-CV-6260, Document 703-1. Specifically, in accordance with the terms of the consent decree, the CPD must "prominently display signs both in rooms of police stations or other CPD locations that hold arrestees or suspects and near telephones which arrestees or suspects have access to. These signs will state: a. that arrestees and suspects have the right to an attorney; b. that if an arrestee cannot afford an attorney, one may be appointed by the court for free; and c. the telephone numbers for the Cook County Public Defender, and any other organization appointed by the Cook County Circuit Court to represent arrestees." *Id*. ¶ 30. Moreover, the consent decree requires the CPD to "provide arrestees access to a phone and the ability to make a phone call as soon as practicable upon being taken into custody." *Id*. ¶ 31.

69-70 (1972). The statute does not define the phrase "reasonable time;" however, Black's Law Dictionary defines the term reasonable as that which is "fair, proper, or moderate under the circumstances" or "sensible." Black's Law Dictionary (11th ed. 2019). In addition, the "statute contains no remedy for an alleged violation." *Williams*, 2017 IL App (1st) 142733, ¶ 29. As such, courts evaluating the voluntariness of a statement made following a purported violation of section 103-3(a) of the Code have considered a defendant's deprivation of access to a telephone to be simply one of the factors to be examined when examining the totality of the circumstances that preceded the defendant's statement. See, *e.g., Id.* ¶¶ 29-36; *People v. Green*, 2014 IL App (3d) 120522, ¶¶ 53-62. Accordingly, even if we were to agree with defendant that the officers in the instant case violated his rights under section 103-3(a) of the Code by failing to provide him access to a telephone during his pre-statement detention, the totality of the circumstances do not support a finding that his statement was involuntary.

¶ 62    We reiterate that defendant was 25-year-old adult at the time he gave his statement. Although he had not been in serious criminal trouble prior to his arrest in the instant case, he did have some prior experience with the criminal justice system. He did not exhibit diminished mental capacity or physical infirmity. Moreover, although his pre-statement detention was lengthy, he was provided with food, drink, bathroom breaks, and contact lens solution. In addition, defendant was informed of his *Miranda* rights on several occasions and evidenced an understanding of those rights. Importantly, the officers abided by defendant's initial invocation of his right to an attorney and only conversed with him about the case when defendant, himself, reinitiated contact with police and waived his right to an attorney after he was again advised of his *Miranda* rights. Ultimately, based on our consideration of the totality of the circumstances, we agree with the circuit court that defendant's statement to authorities was voluntary.

¶ 63   Even if this court was to agree with defendant that his statement was involuntary, the admission of an involuntary statement does not automatically mandate the reversal of his conviction; rather, it is subject to harmless error review.[11]  See *People v. Wrice*, 2012 IL 111860, ¶ 67 (citing *Arizona v. Fulminante*, 499 U.S. 279, 310 (1991), a case in which the United States Supreme Court liked the admission of an involuntary statement to be "similar in both degree and kind to the erroneous admission of other types of evidence" and concluded that such errors are also subject to harmless error review).  To ascertain whether the erroneous admission of evidence is harmless, courts may focus on the error to determine whether it contributed to the conviction; analyze the other evidence to ascertain whether there is overwhelming properly admitted evidence that supports the conviction; and consider whether the improperly admitted statement is cumulative or duplicative of the properly admitted evidence.  *People v. Patterson*, 217 Ill. 2d 407, 428 (2005); *People v. Sandifer*, 2017 IL App (1st) 142740, ¶ 73.  Because "[c]onfessions carry 'extreme probative weight,' " courts have recognized that "the admission of an unlawfully obtained confession is rarely harmless error."  *People v. Harris*, 2012 IL App (1st) 100678, ¶ 76 (quoting *People v. St. Pierre*, 122 Ill. 2d 95, 114 (1988)).  Nonetheless, where the evidence against a defendant is overwhelming or where the involuntary statement is duplicative of other properly admitted evidence, the admission of an involuntary statement will be deemed harmless.  See, *e.g., People v. Mitchell*, 152 Ill. 2d 274, 328-29 (1992) (finding that the admission of the defendant's involuntary statement was harmless where the evidence of his guilt was overwhelming because the defendant also confessed his guilt to someone other than the police and physical evidence also linked him to the crime); *Sandifer*, 2017 IL App (1st) 142740, ¶¶ 74-77 (finding the admission of the defendant's

_____

[11] This rule does not apply to physically coerced confessions, however.  See *Wrice*, 2012 111860, ¶ 84 (distinguishing confessions that result from psychological coercion from those resulting from police brutality or physical coercion, holding: "use of a defendant's *physically coerced* confession as substantive evidence of his guilt is never harmless error") (Emphasis added.)

involuntary statement was harmless "in light of th[e] overwhelming evidence of [his] guilt, which included evidence that the victim and two eyewitnesses identified defendant as the perpetrator of the crime as well as DNA evidence linking him to the crime).

¶ 64 In this case, defendant's videotaped statement was not the only evidence of his involvement in Gonzalez's death. Notably, defendant confessed his involvement in the robbery of a bar and the murder of a bar owner to his long-time friend Apolonio Retama. See *Mitchell*, 152 Ill. 2d at 328-29 (finding that the erroneous admission of the defendant's statement was harmless where the defendant also confessed his guilt to someone else). Although defendant did not specifically identify the bar, he told Retama that he went with Jackson intending to rob a bar and that Jackson repeatedly hit the bar owner with a pipe when they encountered him after the bar had closed. Dr. Cina testified that Gonzalez's injuries were consistent with being struck with a narrow object such as a pipe. In addition, Jose Santos also implicated defendant in the crime. He testified that on October 3, 2010, he was approached by Jackson and defendant who proposed robbing O'Lanagan's. Moreover, cell phone data presented at trial established that defendant and Jackson were in contact around the time of Gonzalez's murder and that Jackson's cell phone "pinged" a tower located near O'Lanagan's. Given the aforementioned evidence against defendant, we find that any purported error in the admission of his statement was harmless.

¶ 65    CONCLUSION

¶ 66 The judgment of the circuit court is affirmed.

¶ 67 Affirmed.