2021 IL App (1st) 191508-U

No. 1-19-1508

Order filed November 5, 2021

Fifth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 17 CR 10483 |
| | ) | |
| GARY CLICQUOT, | ) | Honorable |
| | ) | Alfredo Maldonado, |
| Defendant-Appellant. | ) | Judge, presiding. |

PRESIDING JUSTICE DELORT delivered the judgment of the court.
Justices Cunningham and Connors concurred in the judgment.

**ORDER**

¶ 1    *Held*:  We affirm defendant's conviction for aggravated battery with a firearm over his contention that the State did not prove beyond a reasonable doubt that he fired his gun knowingly, rather than accidentally. Defendant's nine-year sentence was not excessive, so the trial court did not commit plain error in imposing that sentence.

¶ 2                                    BACKGROUND

¶ 3    After a bench trial, defendant Gary Clicquot was convicted of aggravated battery with a

firearm (720 ILCS 5/12-3.05(e)(1) (West 2016) and sentenced to nine years in prison. On appeal,

defendant challenges the sufficiency of the evidence, arguing that the State did not prove beyond a reasonable doubt that he knowingly, rather than accidentally, pulled the trigger of his gun. He further contends that his sentence is excessive because it does not adequately reflect his rehabilitative potential or that he was strongly provoked when he fired his gun. We affirm.

¶ 4    Defendant's conviction arose from the July 1, 2017, shooting of Dante McClain in Chicago. Following his arrest, defendant was charged by indictment with five counts of attempted first degree murder and one count of aggravated battery with a firearm. The State proceeded to trial on all counts. Defendant asserted self-defense or, alternatively, that the shooting was accidental.

¶ 5    At trial, Lolita Smith testified that she was employed as a shift manager at a Walgreens store on South Cottage Grove Avenue. She stated that around 10 p.m. on the day in question, "we had a customer, a little irate, disrespecting a few females that was in the store, and him and the guard had an exchange of words." The customer was later identified as Dante McClain. In court, Smith identified defendant as the store's security guard with whom she had worked for a few months. She knew defendant carried a weapon at work. Smith never saw McClain with any weapons.

¶ 6    Smith testified that McClain was being disrespectful to other customers, but not to any employees. Defendant approached McClain, who was getting a refund, and the two men "had some words." During the process, Smith had McClain step over to another register to handle his return. He apologized for being disrespectful to the customers. Smith described his demeanor at this point as "mild-mannered." As Smith was working on the refund, defendant came over, took McClain's book bag, which was sitting on the counter, and walked outside with it. Smith had not felt

threatened by the presence of the book bag and had not indicated in any way that defendant needed to confiscate it.

¶ 7    After Smith completed the refund, McClain left the store. Shortly thereafter, Smith heard a single gunshot. Defendant came back in the store and told her to call the police, which she did. McClain came back into the store, bleeding from his ear, but then left again. The police arrived, and Smith gave them footage from 16 security cameras. In court, she identified herself, McClain, and defendant in footage depicting her processing McClain's refund and defendant taking McClain's book bag from the counter.

¶ 8    On cross-examination, Smith estimated that on the night in question, McClain was in the store for about 10 to 15 minutes. When asked why she described him as irate, Smith explained that "he was using a lot of vulgarities and just talking to a couple customers." Smith did not remember his exact words, but recalled that he was swearing in the direction of some women and being vulgar toward them, and she agreed that he was "hitting on them" or "coming on to them."

¶ 9    Smith stated that when defendant approached McClain at the counter, defendant was "a bit aggressive." She agreed that part of defendant's job was "to protect the customers in the store and protect [her] from possibly dangerous customers." When asked whether defendant was doing his job when he approached McClain at the counter, Smith answered, "Well, I didn't see a threat or a reason for him to approach him," and added that she did not feel threatened and the other customers had left the store.

¶ 10    When asked if she recalled telling the police that McClain said, "I will beat your a***; I just got out of jail," she stated that she remembered McClain saying he just got out of jail. She did

not recall McClain telling defendant "I will beat your a***," but agreed she could have told the police that McClain made such a statement to defendant.

¶ 11    McClain testified that around 10 p.m. on the date in question, he went to Walgreens to return an item. He had been drinking earlier in the day. He did not have any weapons on his person or in his book bag. While he was returning his purchases, an argument "occurred" with the store security guard. In court, he identified defendant as that guard. McClain did not remember how the argument started or what it was about, but stated he was not swearing during the argument. McClain did not know defendant had a gun.

¶ 12    Toward the end of the return process, defendant picked up McClain's book bag from the counter and took it outside. McClain followed defendant outside to try to retrieve his bag. He narrated, "As I was reaching for my book bag, he was pulling away from me and then he was—he grabbed me by my collar and then I just seen him reach for something and then next thing you know, I got shot." McClain specified that defendant did not pull out his gun until after he grabbed McClain's t-shirt. He stated that defendant pointed the gun at his "facial area" and fired one shot. The bullet went through McClain's left ear and grazed the left side of his neck.

¶ 13    McClain went back into the store to call an ambulance, but then decided to take a bus to the hospital. At the hospital, his wound was treated and he spoke with the police. As a result of the shooting, he lost hearing in his left ear for a few days. At the time of trial, he still had a scar from the bullet behind his left ear. The day after the shooting, McClain went to the police department, met with detectives, and identified defendant in a photo array as the man who shot him.

¶ 14    In court, McClain identified himself and defendant in video clips. McClain stated that at 22:03:32 in the clip depicting the outside of the Walgreens store, defendant was pointing a gun at him and McClain "was trying to get it out my face."

¶ 15    On cross-examination, McClain stated that as of the date of trial, he had "just got diagnosed with schizophrenia" and had been prescribed medication. He admitted that on the afternoon of the shooting, about 3 p.m., he had drunk a half pint of cognac. By the time he went to Walgreens, though, the liquor "had worn off" and he did not feel intoxicated. He testified that he was at the Walgreens store for "a while" before he started the return process, but denied that he harassed anyone or engaged any young women in conversation during that time. He estimated that he was in the store for about five minutes before he and defendant got into an argument, and agreed that the argument started before he tried to make the return and that it lasted for a while.

¶ 16    McClain denied that he came into the store swearing and yelling. Rather, he yelled and swore after he entered the store, although he did not remember "how it started." McClain denied threatening defendant in the store, telling him he would "kick or shoot his a***," or telling him "You don't know who I am," or "Why don't you come down to 79th Street and I'll take care of you." He also denied pointing his finger at defendant as if he had a gun. McClain admitted he may have said, "You don't know who you're dealing with," but did not remember saying he was "a GD." He agreed that one of the video clips showed him pointing his right arm in defendant's direction, but denied that it depicted his hand "in the shape of a gun." McClain stated that he did not remember anything defendant said to him other than "I can stop your return."

¶ 17    McClain explained that he followed defendant out of the store because he was trying to retrieve his bag. He did not remember what he said to defendant outside the store. When asked

whether he may have threatened defendant, McClain answered, "I may have. I don't know. I'm—I'm not going to say I didn't. I might have been a little angry and I don't remember exactly what I said but it's a possibility that I did." McClain stated that he reached for his book bag, and that defendant pushed him away with one arm while the book bag was in his other hand. McClain agreed that he "got in [defendant's] face" before defendant pushed him away, and that "at some point a gun came out." When asked whether he reached for the gun to get it away from his face, McClain answered, "Yeah. I was just blocking the gun." In response to the question, "And did you—did your hand actually touch his arm with the gun or his—the arm or hand that the gun was in?" McClain answered, "Yeah, a little bit." He denied that he ever touched the gun itself. He also denied that the gun discharged when he "grabbed or touched" defendant's arm. Rather, he explained, he was shot "moments later." Finally, McClain agreed that his hearing loss was temporary and had completely healed, and stated the scar behind his ear was permanent.

¶ 18    Silent video footage divided into five clips was entered into evidence as People's Exhibit No. 1 and is included in the record on appeal. Relevant here is a clip that depicts the parking lot and the area outside the store's front doors.

¶ 19    At 22:03:24 in the clip, defendant walks out the store's front doors, carrying a book bag. With his back to the doors, he pulls what appear to be small pieces of paper from the book bag and throws them onto the ground. At 22:03:31, McClain exits the store and walks toward defendant with his right arm loose at his side. McClain's left arm is not visible. Defendant drops the book bag and, with his right arm extended toward McClain's head, turns toward McClain so the men are facing each other. Defendant takes several steps toward McClain, who pushes defendant's right arm away. Defendant grabs or pushes McClain's neck with his left hand. McClain backs up and

pushes defendant's left arm as defendant continues walking toward him. Defendant pushes McClain's arm away and then grabs or pushes McClain's neck with his left hand a second time as he continues walking toward McClain, who continues backing up.

¶ 20    At 22:03:36, defendant points his right arm toward McClain's head. At 22:03:37, McClain pushes defendant's right arm away. Defendant lowers his right arm and grabs or pushes McClain's neck with his left hand a third time, causing McClain's head to snap backwards as he steps back. At 22:03:38, defendant takes another step toward McClain, raises his right arm, and points it at McClain's head. At 22:03:39, a muzzle flash appears by defendant's right hand. As defendant brings his arm down and backs up, McClain leans over at the waist. Defendant takes a few steps toward McClain, who stands up while holding his left hand up near his head. McClain walks toward the doorway and defendant grabs or pushes him with his left hand. McClain then walks into the store, followed by defendant.

¶ 21    The parties stipulated that McClain was treated in the emergency room for gunshot wounds on his left earlobe and the posterior of his neck. During the course of treatment, McClain's blood was drawn and sent for toxicology testing. The results of that testing were negative for drugs and positive for alcohol in the amount of 0.196 milligrams per deciliter of blood serum, the "whole body equivalent" of which was 0.166.

¶ 22    Defendant made a motion for a directed finding on all counts. The trial court granted the motion as to counts III and IV, which charged attempted first degree murder and alleged defendant caused great bodily harm and permanent disability to McClain. The court denied the motion as to counts I, II, and V, which charged attempted first degree murder without the allegation of causing great bodily harm and permanent disability, and count VI, which charged aggravated battery.

¶ 23    Defendant testified that he graduated high school and had "some college degrees." He had a Firearm Owners Identification (FOID) card and a Firearm Control Card (FCC) and had completed a 20-hour course in security training through the Chicago Detective School. On the day in question, he was employed through a security company and working at Walgreens as an armed guard. His duties were to meet and greet customers and provide a safe and secure environment for customers and Walgreens employees. He had been working at the store in question on and off for three years.

¶ 24    On the date in question, defendant's shift was 6:30 p.m. to 10:30 p.m. One of his duties was locking the store's doors at closing. Shortly before 10 p.m., he was standing by the store's two front doors, waiting to lock up. His attention was drawn to McClain, who was in the store's parking lot, because as some "young ladies" were leaving the store, McClain "got into a verbal altercation" with them. McClain then came into the store, gesturing to the women with his middle finger as he did so. Defendant told McClain he was security for the store, that he witnessed McClain harassing the women in the parking lot, and that he was not going to let McClain harass any customers inside the store. McClain responded by giving defendant a "funny look." While McClain walked through the store, defendant noticed he was "slurred," "leaning," and "clumsy." When defendant saw McClain trying to get the attention of some women in the store, he left his post and approached the group. Defendant heard one of the women tell McClain she was too young, and heard McClain reply, "I don't want to talk to you anyway, b***, f*** you." McClain crowded the woman's space and she twice asked defendant to "get him."

¶ 25    Defendant came closer and told McClain not to harass the customers. McClain began to "berate [defendant] with death threats," including saying, "N***, you don't know me. I'll kill your

b*** a***." I'm a GD. I'm off 79th. I know you heard about us." Defendant asked McClain what was wrong with him. McClain put his book bag on the counter, asked loudly if he could "have some motherf*** service," and reached in the book bag. Defendant "got very cautious" and tried to look inside the book bag. He explained in court that he "wanted to be ready, just in case, if he tried to turn around and pull something on me."

¶ 26    At this point, McClain began interacting with Smith. Defendant agreed that when McClain reached in his pants, it caused him "trepidation." Defendant asked McClain what he was reaching for. McClain responded by saying, "F*** you, I f*** you up. You a b***. I kill your fat a***." McClain also said, "[I]f I have to go in my bag, you're a dead motherf***." McClain signed something and Smith handed him a receipt and some currency.

¶ 27    Defendant walked back to the front doors, manually closing one to control the flow of people exiting the store. McClain continued to threaten defendant, saying, "[Y]ou think I'm playing with you, I got your fat a***, I'm going to kill your b*** a***." McClain walked toward defendant, returned to the register area, and then approached defendant a second time near the doors. McClain said, "I'm going to blow your f*** head off," and started fidgeting with his book bag. He then pointed at defendant and said, "I got something in my bag for your big a***. I'm going to blow your f*** brains out. I do this s*** on the regular. This s*** ain't nothing to me." McClain "ma[d]e his hand in the form of a gun" and said, "[A]ll right, you think I'm playing with you. I got you." Defendant asked McClain to finish his transaction and leave.

¶ 28    When McClain reached in his pants pocket, defendant "felt like death was imminent." He testified that he could not allow McClain to pull out a weapon and have everyone's lives at risk. He approached McClain and said, "[M]an, what you got in this bag? Let me see what you got in

this bag." Defendant grabbed the book bag, walked outside with it, and started looking inside the book bag for a weapon. McClain followed defendant with his hand inside his pants. Defendant said, "[L]et me see your f*** hands" and told McClain to back up. When McClain continued to walk toward him with his hand in his pants, defendant pulled his gun out "to secure myself."

¶ 29    Defendant testified that his handgun was equipped with two safety locks: a "limit squeeze" and a "trigger action double function." He explained that the first feature limited the number of bullets that could come out of the gun at a time, and the second was a "small finger safety." He agreed that the second safety would release when the gun "is impressed in your hand" and "if your finger is near the trigger, on the trigger."

¶ 30    Defendant told McClain to back up, but McClain grabbed him. Defendant tried to push McClain back, but McClain kept grabbing him and coming forward. McClain grabbed defendant's arm. Then McClain hit defendant's elbow and the gun went off. Defendant stated that he did not intentionally squeeze the trigger. He also stated that when he pulled out his gun, he never intended to kill McClain or cause him great bodily harm. He did not realize right away that McClain was hit. When he did, he immediately holstered his gun "to avoid any other accincidents" and because he "didn't want any other accidents to happen." McClain tried to go back in the store, and defendant tried to hold him off because he did not know what McClain's intentions were. Eventually, McClain "walked out" of the store and went toward the bus stop.

¶ 31    Defendant further explained that he did not call the police while McClain was in the store because he was busy watching him and hoped he had calmed down. Defendant stated that McClain did not calm down, but rather, "proceeded to threaten my life" and "proceeded to make me feel as if though death was imminent in my eyes." When asked whether he ever saw McClain with a

weapon, defendant answered, "He bragged about having a weapon, he bragged about having it inside his bookbag." Defendant agreed that Smith never called for help and never called the police. He explained that he moved papers that were in the book bag out of the way and then threw them "because it was only paper, and I needed to see the contents of the bag."

¶ 32     Defendant testified that when McClain came outside, he said, "I'm fittin' to kill your fat a***." Defendant turned, saw that McClain's hands were "inside his waist," pulled his gun, and told McClain to back up and show his hands. McClain walked toward defendant and defendant "took a step up." The two men "conjoined," defendant pushed McClain back "to avoid confrontation," but McClain hit defendant's elbow, and the gun accidentally discharged. Defendant stated that he did not pull the trigger intentionally and that he had pointed the gun "on the side of [McClain]. It wasn't directly in his face." When asked whether he pushed McClain again after both men re-entered the store, defendant answered, "I did not want him to pull anything out on me. I had—I had to secure myself. Period. That's why I pushed him back."

¶ 33     In rebuttal, the State called Chicago police officer Joseph Serio, an evidence technician with the forensic firearms laboratory, which had processed defendant's gun. He testified that the gun was a semi-automatic firearm, meaning that with each pull of the trigger, it would fire one shot. The gun had two active safeties: the first was a grip safety located along the back strap of the grip frame, and the second was a trigger safety, which was part of the trigger. He explained that the trigger safety was "a little lever attached to the trigger that has to be first pulled, or remove it to the—rearward before the trigger can be pulled." Serio examined and tested the gun and determined there was nothing wrong with it and it was functioning properly. He did not find that it had a "hair trigger." The manufacturer standard for how much pressure would need to be applied

to fire the gun was anywhere between four and a half to approximately eight pounds. Serio opined, based on his training and experience, that the gun would not accidentally discharge if someone made contact with it by swatting at the barrel. He came to this conclusion because a shooter would have to "actively push in the grip safety while pulling the trigger safety and trigger rearward for this to fire."

¶ 34    On cross-examination, Serio agreed that when the gun is "held like a gun and the grip is in your hand and you're squeezing it, then the grip safety automatically disengages." He disagreed that the trigger safety would automatically disengage when a finger is placed on the trigger, but agreed that beyond "putting [a] finger on the trigger and pulling back," there was no other step required to disengage the trigger safety. Sergio agreed, hypothetically, that if being hit in the arm while holding the gun caused an individual to pull his finger back, applying pressure to the trigger, it could cause the gun to discharge. Sergio also agreed that a toddler could pull the trigger on "a gun like this."

¶ 35    Following closing arguments, the court found defendant not guilty of the three remaining counts of attempted first degree murder (counts I, II, and V), but guilty of aggravated battery with a firearm (count VI). In announcing its ruling, the court stated that the State had not proved defendant intended to kill McClain when he fired his gun in McClain's direction. However, it did not believe defendant's "account that this was an accidental discharge," noting "that does not ring true to this court here." The court found, instead, that "it was a knowing discharge of that firearm, and *** that discharge of that firearm caused an injury to Mr. McClain."

¶ 36    Defendant filed a posttrial motion, asserting that the trial court's finding of guilt on the count charging aggravated battery with a firearm was inconsistent with its acquittal on the counts

charging attempted first degree murder. In the motion, defendant argued that acquittal on the specific intent counts "negates [defendant] having any intent, knowingly or otherwise, to discharge a firearm," and maintained that his uncontradicted trial testimony, supported by the video footage and Serio's testimony, was that the firearm discharged accidentally. The motion conceded guilt of a lesser crime, reckless discharge of a firearm.

¶ 37    The trial court denied the posttrial motion following a hearing. In announcing its decision, the court stated, "I did not find the testimony regarding an accidental discharge to be persuasive. It simply wasn't there." The court also noted that the defendant had claimed self-defense, but it had rejected that theory "based on everything that I saw, the video, the testimony of the manager, especially her testimony and her explanation of the events that unfolded here, this certainly was not a self-defense case." The court concluded that its ruling at trial was not in error.

¶ 38    At sentencing, the trial court indicated it had the presentence investigation (PSI) report. The PSI report revealed that defendant, who was 33 years old, had no history of juvenile delinquency or adult criminality. He reported having had a "good childhood" and a close relationship with his parents, although his father died of natural causes when defendant was an adult. Defendant also had a good relationship with his siblings and step-siblings. He reported never having been married or having fathered any children. He graduated from high school and completed 40 hours of college credit. He worked in the security field for three years and had plans to continue his education and earn a degree in business. He reported spending his free time listening to music, watching HGTV, and playing poker and basketball. Defendant denied any affiliation with any street gang and stated that he had three close friends, one of whom was a firefighter and another of whom was a correctional officer. He reported being in good physical

health and stated he had never seen a psychiatrist and had never been diagnosed with a learning disability or behavior disorder. The probation officer who prepared the PSI report indicated that defendant was very cooperative and answered all questions without hesitation.

¶ 39    Counsel tendered to the court letters from defendant's mother and brother, a former teacher, and a deacon, which noted his remorse and lauded defendant's loving support of family members and others in need, his generosity, and volunteer work.

¶ 40    In allocution, defendant asserted that during the incident, he made a "logical decision" and took the "best option" to "isolate the situation" and thus protect himself and the other people in the store. He stated that it was unfortunate that his gun went off. He further stated that he did his job to the fullest of his ability and felt he did the best he could in the situation.

¶ 41    In announcing the sentence, the court indicated that it had considered the facts of the case; counsel's arguments; the PSI report; the letters submitted in mitigation; the testimony of defendant's mother; defendant's statement in allocution; defendant's history, character, and attitude; and the statutory factors in aggravation and mitigation. The court noted that defendant had no criminal history, worked in security, had a loving family, and was a productive member of society, as reflected in the PSI report and the letters submitted in mitigation. However, the court stated that "what [it] did not see" was a "logical use" of a firearm. The court stated, "What you did that evening, [defendant], was not logical, it was not self-defense." The court noted that the situation with McClain, who "had his issues, he had his problems," had de-escalated before defendant aggravated it. The court explained that Smith's testimony and the videos "made that apparent," noting that defendant took McClain's book bag and dumped its contents, which in the court's view was "not a reasonable act."

¶ 42    The court observed that the incident was sad and tragic, but could have been far worse, as "[i]nstead of that graze wound, that bullet could have entered the victim's head and would have killed him instantly and we would be having a completely different scenario here." After noting it had considered the financial impact of incarceration, the court stated that under the circumstances, it was imposing a sentence of nine years in prison.

¶ 43                                        ANALYSIS

¶ 44    On appeal, defendant first challenges the sufficiency of the evidence to convict. When reviewing the sufficiency of the evidence, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979). All reasonable inferences from the evidence must be drawn in favor of the State. *People v. Hardman*, 2017 IL 121453, ¶ 37. The credibility of the witnesses, the weight to be given their testimony, and the resolution of any conflicts in the evidence are within the province of the trier of fact, and a reviewing court will not substitute its judgment for that of the trier of fact on these matters. *People v. Brooks*, 187 Ill. 2d 91, 131 (1999). Reversal is justified only where the evidence is "so unsatisfactory, improbable or implausible" that it raises a reasonable doubt as to the defendant's guilt. *People v. Slim*, 127 Ill. 2d 302, 307 (1989).

¶ 45    Defendant was convicted of aggravated battery with a firearm. As charged in this case, a person commits aggravated battery with a firearm when, in committing a battery, he knowingly discharges a firearm other than a machine gun or a firearm equipped with a silencer and causes any injury to another person. 720 ILCS 5/12-3.05(e)(1) (West 2016). In this court, defendant does not dispute that the gun he was holding discharged and caused bodily harm to McClain. Rather,

the only element of this crime defendant challenges on appeal is the requisite mental state. He contends that the State did not prove beyond a reasonable doubt that he knowingly and voluntarily discharged the gun.

¶ 46    Defendant asserts that he and McClain engaged in a physical struggle and that the video shows McClain made contact with defendant's shooting arm two seconds before the gun discharged. Acknowledging that his gun did not have a malfunctioning "hair trigger," he maintains that it would have taken only a small amount of pressure on the trigger to disable the gun's safety mechanisms and fire it. Defendant claims that McClain's application of force against his arm may have moved the gun or his hand in such a way as to cause an involuntary muscle spasm, or may have induced a "fist reflex," that is, an instinctive and involuntary closing of the hand. He argues that his testimony explaining the discharge of the gun was unintentional and caused by McClain having struck his elbow is consistent with the video footage, the testimony of the State's firearms expert, and "reasonable inferences from other surrounding circumstances." Defendant concludes that his conviction must be reversed outright or, in the alternative, reduced to the lesser included offense of reckless discharge of a firearm.

¶ 47    A material element of every offense is a voluntary act. 720 ILCS 5/4-1 (West 2016). "[T]he criminality of [a] defendant's conduct depends on whether he acted knowingly or intentionally, or whether his conduct was accidental. Determining whether the conduct was knowing or intentional, or was accidental, [is] the responsibility of the trier of fact." *People v. Robinson*, 379 Ill. App. 3d 679, 684-85 (2008). A person acts "knowingly" when he is "consciously aware" that a result is "practically certain to be caused by his conduct." 720 ILCS 5/4-5(b) (West 2016). A defendant's mental state is ordinarily inferred from circumstantial evidence, and this task is particularly suited

to the finder of fact. *People v. Moore*, 358 Ill. App. 3d 683, 687-88 (2005). When presented with conflicting versions of events, it is the trial court's responsibility to make credibility determinations and decide which version to believe. *People v. Flemming*, 2015 IL App (1st) 111925-B, ¶ 58.

¶ 48    After viewing the evidence in the light most favorable to the prosecution, we find that a rational trier of fact could conclude that defendant knowingly discharged his firearm. The evidence showed that defendant and McClain had a verbal altercation inside the Walgreens store, during which Smith did not feel threatened by McClain's actions. According to Smith's description of events, McClain had calmed down to the point of being "mild-mannered"—and had even apologized for being disrespectful earlier—when defendant escalated the encounter by picking up McClain's book bag taking it outside. The video footage depicting the later events outside of the store shows defendant scattering some of the book bag's contents onto the ground and defendant and McClain pushing each other's arms several times. Then, in the three seconds between 22:03:36 and 22:03:39, defendant points his right arm toward McClain's head; McClain pushes defendant's right arm away; defendant lowers his right arm and grabs or pushes McClain's neck with his left hand; McClain's head snaps backwards as he steps back; defendant takes a step toward McClain, raises his right arm, and points it toward McClain's head; and the gun in defendant's right hand discharges.

¶ 49    Although defendant testified that the gun discharged accidentally when McClain hit his elbow, the court was not required to accept his explanation of events. The court specifically found that defendant's claim of accidental discharge was not credible, stating at trial that "that does not ring true to this court here," and stating at the hearing on the posttrial motion, "I did not find the

testimony regarding an accidental discharge to be persuasive." See *Moore*, 358 Ill. App. 3d at 688 (where the defendant indicated his gun " 'went off' on its own, the jury was free to find that statement self-serving and incredible based on the circumstances"); see also *People v. Walker*, 2021 IL App (1st) 190410-U, ¶¶ 22-24 (affirming conviction for aggravated battery where the record supported an inference that the defendant's head-butt of the victim was a purposeful act and not an accidental result of a loss of balance).

¶ 50 Defendant's claim that the gun accidentally went off when McClain hit his elbow is not corroborated by the video, which shows that after McClain pushed defendant's right arm away, defendant dropped his right arm to his side, grabbed or pushed McClain with his left hand, took a step toward McClain, and then raised his right arm and pointed it at McClain's head before the gun discharged. Thus, the video confirms McClain's testimony that the gun did not discharge when he touched defendant's arm, but rather, "moments" later. This evidence and the reasonable inferences therefrom were sufficient for a rational trier of fact to determine that defendant knowingly discharged his gun.

¶ 51 Defendant nevertheless argues that the circumstances surrounding the shooting support a finding that the discharge of his firearm was unintentional, rather than knowing. Specifically, he asserts that his actions were motivated by his duty to protect the customers and by the seeming threat that McClain posed to his own life, and that his "search" of McClain's book bag "indicates the sincerity" of his concern that McClain was armed.

¶ 52 Defendant's arguments essentially ask this court to ignore the credibility determinations made by the trial court and retry him on a cold record. This is not the proper function of a court reviewing a challenge to the sufficiency of the evidence. See *People v. Daheya*, 2013 IL App (1st)

122333, ¶ 61 (quoting *People v. Ross*, 229 Ill. 2d 255, 272 (2008)) (" 'the reviewing court does not retry the defendant, and the trier of fact remains responsible for making determinations regarding the credibility of witnesses, the weight to be given their testimony, and the reasonable inferences to be drawn from the evidence' "). Moreover, when a trier of fact has made an inference regarding a defendant's mental state, a reviewing court should not substitute its judgment for that of the trier of fact unless the inference accepted by the trier of fact is inherently impossible or unreasonable. *People v. Wehrwein*, 209 Ill. App. 3d 71, 81 (1990). Based on the evidence, we conclude that the trial court's finding of the mental state of knowledge was not so inherently impossible or unreasonable as to require reversal. See *id.* The State's evidence was not "so unsatisfactory, improbable or implausible" that it raises a reasonable doubt as to the defendant's guilt. See *Slim*, 127 Ill. 2d at 307. Accordingly, defendant's challenge to the sufficiency of the evidence fails.

¶ 53    Defendant's second contention on appeal is that his sentence is excessive because it does not adequately reflect his rehabilitative potential or that he was strongly provoked when he fired his gun. He acknowledges that he has forfeited this issue because he did raise it in his postsentencing motion, but he argues that we may nevertheless reach it under the first prong of the plain error doctrine.

¶ 54    The plain error doctrine is a narrow and limited exception to forfeiture. *People v. Hillier*, 237 Ill. 2d 539, 545 (2010). To obtain relief under this doctrine in the sentencing context, a defendant must show either that (1) the evidence at the sentencing hearing was closely balanced, or (2) the error was so egregious as to deny the defendant a fair sentencing hearing. *Id.* However,

before addressing either prong, a defendant must first show that a clear or obvious error occurred. *Id.* If he fails to meet his burden, the procedural default will be honored. *Id.* Here, we find no error.

¶ 55     A trial court has broad discretionary powers in imposing a sentence, and its sentencing decisions are entitled to great deference on review. *People v. Alexander*, 239 Ill. 2d 205, 212 (2010). Sentencing decisions are entitled to great deference on appeal because the trial court is in a superior position to fashion an appropriate sentence based on first-hand consideration of the relevant sentencing factors, including the defendant's credibility, demeanor, moral character, mentality, social environment, habits, and age. *People v. Fern*, 189 Ill. 2d 48, 53 (1999). Although the trial court's consideration of mitigating factors is required, it has no obligation to recite each factor and the weight it is given. *People v. Wilson*, 2016 IL App (1st) 141063, ¶ 11. Absent some indication to the contrary, other than the sentence itself, we presume the trial court properly considered all relevant mitigating factors presented. *People v. Sauseda*, 2016 IL App (1st) 140134, ¶ 19.

¶ 56     In reviewing a defendant's sentence, this court will not reweigh the aggravating and mitigating factors and substitute our judgment for that of the trial court merely because we would have weighed these factors differently. *People v. Busse*, 2016 IL App (1st) 142941, ¶ 20. A sentencing determination will not be disturbed absent an abuse of discretion. *People v. Stacey*, 193 Ill. 2d 203, 209-10 (2000). Sentences that fall within the permissible statutory range may be deemed to be the result of an abuse of discretion only where they are "greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense." *Id.* at 210.

¶ 57  We find that the court did not abuse its discretion in sentencing defendant to nine years' imprisonment. The sentencing range for aggravated battery with a firearm, as charged here, is 6 to 30 years. 720 ILCS 5/12-3.05(e)(1), (h) (West 2016); 730 ILCS 5/5-4.5-25(a) (West 2016). Because the nine-year sentence imposed in this case is within the statutory sentencing range, it is presumed proper. *People v. Knox*, 2014 IL App (1st) 120349, ¶ 46.

¶ 58  Defendant does not dispute that his sentence fell within the permissible sentencing range and is presumed proper. Rather, he argues that his sentence is excessive because it does not reflect his rehabilitative potential where he had a strong employment history and a history of personal responsibility, and because he had no history of criminal behavior, gang involvement, mental health treatment, or substance addiction. Defendant also notes in mitigation that he had earned some college credit, helped take care of his dying father, was a father figure to his deceased brother's sons, was a friend ofwith a firefighter and a corrections officer, and had expressed remorse to his mother. He further argues that the court failed to accord proper weight to the statutory mitigating factor of "strong provocation" (730 ILCS 5/5-5-3.1(a)(3) (West 2016)) because his "alleged criminal conduct, as a security guard, in shooting and lightly wounding an intoxicated and schizophrenic customer was strongly provoked in that [McClain] was behaving in a threatening and harassing manner" that made him believe McClain was armed and that caused him to fear for his life.

¶ 59  The record demonstrates that the court was well aware of the mitigating factors identified by defendant on appeal. The PSI report, which the trial court stated it reviewed, indicated all of the favorable characteristics upon which defendant relies to support his argument that his sentence

was excessive. As noted above, where mitigating factors are presented, we may presume that the trial court properly considered them. *Sauseda*, 2016 IL App (1st) 140134, ¶ 19.

¶ 60    With regard to defendant's argument that the trial court failed to accord proper weight to the statutory mitigating factor of "strong provocation," we agree with the State that the record does not support a claim that strong provocation existed. When given the opportunity to speak in allocution at sentencing, defendant did not speak of provocation, but rather, asserted that he made a "logical decision." He stated that it was unfortunate his gun went off and maintained that he did the best he could in the situation. The court responded that it did not see a "logical use" of a firearm, and, based on Smith's testimony and the video footage, stated that the situation with McClain had de-escalated before defendant aggravated it when he grabbed McClain's book bag and "dumped the contents." Thus, not only did defendant not identify provocation as a factor at sentencing, but the trial court found it was defendant, and not McClain, who acted in a provoking manner after the situation had de-escalated. We conclude that the court did not abuse its discretion by failing to consider defendant's rehabilitative potential or the statutory mitigating factor of "strong provocation."

¶ 61    We further note that in addition to considering the evidence in mitigation, the trial court made clear at sentencing that it was mindful of the seriousness of the offense. The court observed that instead of grazing McClain's ear and neck, the bullet shot from defendant's gun could have "entered the victim's head and would have killed him instantly." Moreover, the court emphasized that defendant could have hit someone else outside the store, and thus, defendant's "actions that night put people in jeopardy." The most important sentencing factor is the seriousness of the offense, and a trial court need not give greater weight to a defendant's rehabilitative potential or

other mitigating factors than to the severity of the offense. *People v. Sandifer*, 2017 IL App (1st) 142740, ¶ 82. The court was entitled to weigh all of the factors in aggravation and mitigation, and selected a sentence near the bottom of the applicable range. Defendant's arguments on appeal amount to a request that we reweigh those factors, but we will not substitute our judgment for the trial court's simply because we may have weighed them differently. *Alexander*, 239 Ill. 2d at 213.

¶ 62       In sum, we cannot find that defendant's sentence, a term three years above the statutorily required minimum, is "greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense." *Stacey*, 193 Ill. 2d at 210. Accordingly, we find no abuse of discretion. Where no clear or obvious error occurred, defendant's contention that his sentence is excessive remains forfeited. See *Hillier*, 237 Ill. 2d at 545.

¶ 63                                                    CONCLUSION

¶ 64       We affirm the judgment of the circuit court.

¶ 65       Affirmed.